[L. A. No. 14272. In Bank.—October 4, 1933.]
(Consolidated Cases.)

THE CITY OF LOS ANGELES (a Municipal Corporation), Respondent, v. L. W. KLINKER et al., Defendants; THE TIMES–MIRROR COMPANY (a Corporation), Appellant.

THE CITY OF LOS ANGELES (a Municipal Corporation), Respondent, v. THE TIMES–MIRROR COMPANY (a Corporation), Appellant.

THE CITY OF LOS ANGELES (a Municipal Corporation), Respondent, v. THE TIMES–MIRROR COMPANY (a Corporation) et al., Defendants; THE TIMES–MIRROR COMPANY (a Corporation), Appellant.

Hunsaker & Cosgrove, T. B. Cosgrove and Frank B. Yoakum, Jr., for Appellant.

Erwin P. Werner and Ray L. Chesebro, City Attorneys, Frederick von Schrader, Assistant City Attorney, and Arthur W. Nordstrom and Arthur Loveland, Deputies City Attorney, for Respondent.

PRESTON, J.—This appeal is from the interlocutory judgment in an eminent domain proceeding to appropriate to public use certain real property and the improvements thereon situated at the northeast corner of Broadway and First Streets, Los Angeles, and owned by the appellant, The Times-Mirror Company, a corporation. It comprises the site and buildings used for the publication and distribution of the well-known daily newspaper, "The Los Angeles Times", a site that at the time of this action had been utilized for the purpose for about forty-five years. Two proceedings were instituted by the city of Los Angeles to acquire distinct portions of this property of appellant: one action to acquire a part for public grounds and buildings; the other to acquire the remainder for street purposes. The two portions comprise in the aggregate the entire property of appellant at this location. The trial court, over appellant's objection, consolidated the proceedings as to appellant's property and later sat therein at the trial without a jury, rendering the interlocutory judgment in condemnation here involved. The Times-Mirror Company, a corporation, has appealed.

Voluminous and exhaustive briefs, aggregating in excess of $1,000 pages, face us in the determination of this cause. However, we need not give exhaustive consideration to all the points urged as the learned trial judge, in our opinion, excluded from consideration, after first admitting it, much material testimony respecting the market value of the property. This evidence should have been allowed to remain and the error we deem of such far-reaching detriment to appellant as to compel a reversal of the judgment. Appellant states the question in this connection in long and short form as follows:

Long form: "In condemnation proceedings of premises continuously and successfully devoted for a period of over forty-five years to the publication of a metropolitan newspaper, does the processing equipment constitute fixtures and an improvement pertaining to the realty within the meaning of section 1248 of the Code of Civil Procedure, for which compensation must be made, when it appears that such processing equipment was especially designed for and installed in a steel and masonry building located upon the premises, the building itself being especially designed for the site and especially designed to accommodate the processing equipment, and the processing equipment being especially designed for installation in the building; the land, building, and processing equipment all having been acquired, constructed, and maintained as a permanent construction and installation for the purpose and used exclusively in the publication of a metropolitan newspaper of five daily editions totaling 175,000 copies and a Sunday edition exceeding 250,000 copies; said processing equipment consisting principally of eight large presses resting upon, embedded in, and permanently fastened to, huge concrete foundations especially designed for the building, and the building being especially designed to accommodate such press foundations, the plans for each having been prepared in contemplation of the plans for the other, the work of installation and construction of the building, the press foundations, and the presses having proceeded in unison, said foundations, although incorporated into concrete portions of the building structure, nevertheless carrying the weight of the presses directly upon the ground surface, while other portions of the processing equipment of great weight and size are installed in portions of the building especially designed and constructed to carry this particular heavy equipment which, for the most part, is permanently attached to the building?"

██ Short form: "Within the meaning of subdivision 1 of section 1248 of the Code of Civil Procedure does the processing equipment of a plant given over to the publication of a metropolitan daily newspaper constitute an improvement pertaining to the realty where the plant equipment is especially designed for, and permanently installed in, a steel

and masonry building particularly designed for the site and to accommodate such equipment?"

Respondent states this same issue as follows: "Within the meaning of subdivision 1 of section 1248 of the Code of Civil Procedure, does the processing equipment of The Times-Mirror Company's newspaper plant constitute an improvement pertaining to the realty, where the processing equipment is necessary to the business of The Times-Mirror Company, can be readily removed without injury to the realty or to the equipment, and has been assessed and taxed, carried on the books of The Times-Mirror Company, and treated in a proposed sale to the County of Los Angeles, as removable personal property?"

A glance at these questions discloses that we have presented the question of whether certain machinery known as "processing equipment" is to be classed as real or personal property. Appellant insists that it constitutes fixtures, a part of the improvements on the real property. Respondent insists that it is personalty, or, at any rate, that the evidence is in such condition that the decision of the court below that it is personalty cannot be disturbed. In this behalf it is to be noted that respondent's position rests upon the claim that the machinery may be removed without injury to the building and, moreover, that appellant, by its acts and conduct, has shown that it now regards this equipment as personalty. Some of the pertinent facts may now be stated:

The site at the corner of First and Broadway Streets was occupied from 1886 to 1910 by a building used for publication and distribution of appellant's metropolitan daily newspaper, "The Los Angeles Times". In 1910, this original structure was dynamited and burned, but appellant soon purchased adjoining properties and by October, 1912, it had completed the erection at said location of a larger edifice, which has since served continuously and exclusively as the main building of the permanent home of said newspaper. It consists of three stories underground and five stories above ground and is designed to carry two extra stories. From time to time appellant has continued the enlargement of its property holdings by purchase of adjoining land and structures so that now it also owns and uses, in connection with publication and circulation of said daily newspaper, the said

main building, a northerly annex thereto constructed in 1921, and four so-called secondary buildings located on the north side of First Street.

Within the main building and annex, and the basement of the most easterly of said secondary buildings, are located the machinery and equipment referred to throughout the trial of this cause as the "processing equipment", which appellant contends passed with the freehold and constituted an improvement pertaining to the realty. In this behalf witnesses for appellant testified that the said main building and annex were especially designed and constructed to accommodate the permanent installation of the processing equipment therein. Certain floors were designed to carry heavy machinery and equipment not found in ordinary buildings of steel frame. One of the floors above ground surface was designed to carry a load of 275 pounds per square foot. Anticipating expansion, the building was also designed to carry two additional stories, namely, a fifth and a sixth story above ground surface. The annex, built in 1921, was the same type of construction as the main building, carrying also safety features with reference to load capacity. The preparation of plans to use the land on which the secondary buildings stand, for the construction of an addition to said main building and annex, was interrupted by these eminent domain proceedings.

Witnesses for respondent testified that said main building contained no unusual structural features save the fourth floor, which admittedly was designed to carry more than customary weight. They denied also that the building was so designed as to be capable of carrying two more floors, without added strengthening in the columns.

In the construction of the main building, the foundations for the great presses were constructed independently of, but blending with, the foundations for the building, to prevent vibration which might have affected the stability of the building foundations. It further appears that, following custom, the press foundations were built according to plans of the press manufacturers and that they extended from the basement floor down through the sub-basement to the ground. Five presses were installed during erection of the main building; two more were added about 1926. Installation of the latter required structural changes in the building and a tear-

ing out of part of the mezzanine basement floor. The presses are from 23 to 42 feet in length, from 9 to 11 feet in width and from 16 to 25 feet in height, weighing from 80 to 147 tons each. They are installed on the massive special press foundations, resting immediately upon the ground and containing some 13,331 cubic feet of reinforced concrete.

The so-called "processing equipment" may be classified to include, in addition to the above-described presses and the pressroom equipment, the following: Composing-room equipment; stereotype equipment and engraving equipment. Office equipment is not included.

The pressroom equipment consists of: The large presses above described on their massive masonry foundations. Presses Nos. 1 and 2 are two stories high and are equipped with runways, ladders and mezzanine landing for the workmen. Other presses are supported by cast-iron columns going through the floor to the concrete foundation and are anchored to the masonry bolts embedded therein. The presses are operated by a drive mechanism under the floor, which connects, by gear system, to a series of vertical shafts which drive their individual cylinders. The drive shaft goes to a motor located on a specially constructed base in the subbasement. The heavy shafting is held on hangers fastened into the ceiling and it comes through the floor and is geared into the press. Removal of the presses embedded in concrete would leave open pits in the floor.

The stereotype department is located on the fourth floor, which, as above mentioned, was especially constructed to carry loads of 275 pounds per square foot as compared with lesser loads on other floors above ground level. This equipment is not as heavy or as large as the press equipment, but it appears that pieces weighing up to six tons are permanently embedded in or attached to floors and walls and connected with power, gas, water and plumbing lines. The equipment includes what is known as the autoplate machine, really a large furnace weighing five or six tons, with metal bath and casting boxes, having individual foundations grouted down, cemented into the floor foundation. It also includes other large furnaces used for melting metal connected with casting boxes in which the metal is cast into cuts or pigs; also melting or dross furnaces and sawing machinery bolted to the floor and connected with the power

line. Similar machinery, but of lesser weight, is found in the monotype department.

While respondent contends that the bolting of a large part of this machinery to the floor proves it to be removable personal property, appellant claims that where machinery is described as bolted to the floor, the bolts are either set into the slab of concrete itself or wood blocks are inserted in the concrete slabs and lag screws are driven down through the machine into the blocks set in the concrete.

In the composing division are forty linotype machines, each connected with the main power feed system by conduits attached to the ceiling coming up through the floor beneath and into the motors constituting a part of the machines. Sixteen of the machines are connected with water and drainage systems of the building; in addition this composing equipment includes proof-presses, saw trimmers, imposing tables, steel cabinets, cases, etc.

The engraving equipment is located in the three-story building to the east of the main building, which is designed by the architect who planned the main building and annex. Much of this equipment is bolted to or built into the floors or walls, and is connected with the water and drainage system by special acid-resisting pipes.

The rules that are to guide us in reaching a conclusion on this question are not in dispute and are practically universal throughout the United States. It is in the application of these tests that conflicts are found in the decisions of the courts.

Section 1248 of the Code of Civil Procedure, subdivision 1, provides: "The court, jury, or referee must hear such legal testimony as may be offered by any of the parties to the proceedings, and thereupon must ascertain and assess: 1. The value of the property sought to be condemned, and all improvements thereon pertaining to the realty, and of each and every separate estate or interest therein; if it consists of different parcels, the value of each parcel and each estate or interest therein shall be separately assessed."

"Fixtures upon the property taken must be valued and paid for as part of the real estate, and any depreciation in the value of fixtures upon the part not taken is to be taken into consideration, the same as damage to the soil itself." (2 Lewis on Eminent Domain, 3d ed., p. 1276, sec. 728.)

■ "Where land is condemned for public uses, the value of buildings or other improvements and fixtures on the land must be considered in determining the owner's compensation." (20 Cor. Jur., p. 799.)

"When fixtures become part of the realty, if the land on which the building stands is taken in whole or in part for the public use, the owner is entitled to have the fixtures considered in determining the amount of his compensation." (10 R. C. L. 142.)

■ Section 660 of the Civil Code also furnishes some useful guides in the matter: "Definition of fixtures. A thing is deemed to be affixed to land when it is attached to it by roots, as in the case of trees, or vines, or shrubs; or imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws; except that for the purposes of sale, emblements, industrial growing crops and things attached to or forming part of the land, which are agreed to be severed before sale or under the contract of sale, shall be treated as goods and be governed by the provisions of the title of this code regulating the sales of goods."

■ All parties agree, however, in determining what are fixtures, that the rule announced in *Lavenson* v. *Standard Soap Co.*, 80 Cal. 245, 250 [22 Pac. 184, 185, 13 Am. St. Rep. 147], is the correct rule: "In order to determine whether a thing is a fixture or not, we must look at the manner in which it is annexed, the intention of the person who made the annexation, and the purpose for which the premises are used."

In *Gosliner* v. *Briones*, 187 Cal. 557, 560 [204 Pac. 19, 20], the rule is again stated: "As a general rule, the intent of the parties is a controlling criterion in ascertaining whether property is permanently attached to the land or retains its identity as personalty; the character of the annexation to the land or other realty and the use made of the property are important considerations, but in most cases are subsidiarily employed for the purpose of testing the intention of the parties (citing many cases)." (See, also, *Breyfogle* v. *Tighe*, 58 Cal. App. 301 [208 Pac. 1008].)

The rule is again illustrated in *Oakland Bank of Savings* v. *California Pressed Brick Co.*, 183 Cal. 295, 298 [191 Pac.

524, 525], as follows: "The boilers in controversy were set in the building on the land on a concrete foundation made to receive them and then bricked in by a wall, so as to retain the heat. The heavy machinery was set on concrete blocks built in the ground for that purpose with large bolts or rods brought up through the concr__e by means of which the machines were fastened down. The machinery, engine, and boilers were connected together by pipes, rods, shafts, and belts, so that the engine would operate the machinery, and they were all attached for the purpose of using them permanently in the plant in the making of brick. There can be no doubt that they were affixed to the land so as to become real property, under the definition given in section 660."

An engraving plant was held to be a fixture and a part of the realty in the case of *In re Post Office Site,* 210 Fed. 832.

In *White* v. *Cincinnati etc. R. R.,* 34 Ind. App. 287 [71 N. E. 276], the machinery of a paper mill was held a part of the realty. The court in that case set forth the three elements regarded as a true criterion of an immovable fixture, in this language: " 'The united application of three requisites . . . is regarded as the true criterion of an immovable fixture: (1) Real or constructive annexation of the article in question to the freehold; (2) appropriation or adaptation to the use or purpose of that part of the realty with which it is connected; (3) the intention of the party making the annexation to make the article a permanent accession to the freehold.' " Continuing, the court said: " 'The same rule exists in proceedings to take the land under the right of eminent domain, and the commissioners of estimate have no right to restrict the assessment to the simple value of the land, compelling the owner to retain the fixtures on the premises, and exempting the city from an obligation to take and pay for them as a part of the land.' . . . It is clear from the record that the improvement upon the real estate consists not simply of certain buildings containing various pieces of machinery, but of a paper mill—a thing complete within itself. . . . One machine essential in the manufacture of paper might be so annexed to or constitute such part of a building that it could not be removed, and another machine equally essential might be easily removed, and yet, when the two machines are separated, each is without value for the uses intended. In such case both of the machines should be

considered as attached to the freehold—one by real and the other by construction annexation. As the machinery is permanent in its character, and, being essential to the purpose for which the buildings are used, is a fixture, it must be regarded as realty, and goes with the buildings. The land, water power, buildings, and machinery constitute a paper-mill plant—a unit. It has or has not a value as such, just as a building is valued, not by fixing a value on the different materials composing it, but as a building.''

In *Jackson* v. *State*, 213 N. Y. 34 [106 N. E. 758, Ann. Cas. 1916C, 779, L. R. A. 1915D, 492], in a proceeding to condemn a factory for public use, the court below made no award covering the plant equipment, stating that after appropriating the land and building, the condemnor had the right to refuse to pay for the fixtures therein. The Court of Appeal, in reversing this holding, said: ''It is tolerable that the state, after condemning a factory or warehouse, should surrender to the owner a stock of second-hand machinery and in so doing discharge the full measure of its duty. Severed from the building, such machinery commands only the prices of second-hand articles; attached to a going plant, it may produce an enhancement of value as great as it did when new. The law gives no sanction to so obvious an injustice as would result if the owner were held to forfeit all these elements of value. An appropriation of land, unless qualified when made, is an appropriation of all that is annexed to the land, whether classified as buildings or as fixtures, and so it has frequently been held.''

In *Banner Milling Co.* v. *State*, 240 N. Y. 533 [148 N. E. 668, 41 A. L. R. 1020], the city of Buffalo took steps to condemn property used as a flour-mill. Treating the question of fixtures, the court held that the plant as a unit should be considered, using the following language: '' 'The claimant is entitled to recover the value of its physical property as it existed at the time of the appropriation. That does not mean that its value is to be arrived at by taking the value of the various elements and items making up the property separately, and considering them without reference to each other, and then adding together these sums. The claimant is entitled to compensation, not merely for so much land, so much brick, lumber, materials, and machinery, considered separately; but, if they have been combined, adjusted, syn-

chronized, and perfected into an efficient functioning unit of property, then it must be paid for that unit, so combined, adjusted, synchronized, and perfected, as it existed at the moment of appropriation. In that limited sense, it is entitled to the ''going value''—if such a term is permissible—of its physical property. In fixing the amount of award we will be guided by that principle.' ''

To the same effect may be cited *Mayor etc. of Baltimore* v. *Himmel,* 135 Md. 65 [107 Atl. 522]; see, also, *King* v. *Minneapolis Union Ry. Co.,* 32 Minn. 224 [20 N. W. 135]; *Yates etc. Co.* v. *City of Memphis,* 137 Tenn. 642 [194 S. W. 903]; *City of Chicago* v. *Farwell,* 286 Ill. 415 [121 N. E. 795].

It is worthy of note also in this connection that in eminent domain proceedings, which are *in invitum,* the relation between the parties is regarded as similar to that of vendor and purchaser rather than landlord and tenant, in testing the transaction for the presence of irremovable fixtures.

It should be noted also that respondent cites a number of cases, some of which on their surface seem to be at variance with the authorities referred to above, but we need not pause to compare or analyze them for we are satisfied that the better holding is the one which we have adopted.

It is, of course, true that the manner in which the fixtures are annexed, the purpose for which the premises are used and the intention of the persons who made the annexation are all to receive weight in settling this issue. It is also true that the intention of the parties, where mutual rights are involved, is of controlling importance, such as in the case of a lessor and lessee, or vendor and vendee under a conditional sales contract. But where, as here, the owner's own conduct alone is to be reviewed, the nature and adaptability of the machinery and the manner of its installation would practically control the question of intent as against a vendor or a condemnor. Here we have not only the manner of annexation of the fixtures and the purpose for which the premises were used, but we have the acts and conduct of the owner in installing these fixtures and, when viewed as a whole, we are unable to escape the conclusion that so much of the fixtures as are denoted in the record by the term ''processing

equipment" are, actually or constructively, an improvement of the real property.

The chief items of this equipment are the several presses above described. For them, massive concrete foundations were constructed which, although independent, were connected both with the ground and with the foundation of the building itself. These foundations were especially designed to accommodate the presses, which were themselves especially designed and built to be used in this particular building. The presses were supported by and, in the main, embedded in these concrete foundations. Such acts as these on the part of an owner cannot be overthrown by equivocal circumstances from which a different purpose might be suspected. We, therefore, do not accord particular significance to the fact that this machinery was assessed, with the knowledge of appellant, by the county authorities as personal property, nor to the fact that on appellant's books it was styled "plant equipment". Still less weight do we attach to the fact that after the intention to take this property for public use had been manifested, the owner negotiated with the public authorities upon a basis which contemplated the salvaging and removal of the equipment from the building to some other location.

■ Appellant offered the testimony of several witnesses who gave their opinions as to the market value of the property and the improvements thereon, including as an element the existence of this machinery as fixtures therein. The court at first admitted this testimony but at the conclusion of the trial held that all machinery of the building was personal property; hence the testimony of all appellant's witnesses rested in part upon an erroneous foundation and, accordingly, the whole thereof was stricken from the record. This left only the testimony of respondent's witnesses, three in number. The court thereupon followed the testimony of one of them and fixed the market value of appellant's property, excluding the machinery, at $1,021,345. As the processing machinery should have been regarded as fixtures, it is manifest that prejudicial error was committed as against the rights of the appellant.

■ It is contended that error was committed by the order of the court consolidating the two actions, in so far as they applied to appellant's property. It is contended that

under subdivision 5 of section 1244 of the Code of Civil Procedure, consolidation may take place only where different properties are being condemned for the same public use, whereas, the situation here is that a part of appellant's property is being taken for public buildings and grounds and the remainder for street purposes; as to the former, the fee is sought; as to the latter an easement only. However, it is our view that under sections 1048 and 1256 of the Code of Civil Procedure, the court had the discretion to make the order of consolidation. This is true because in legal contemplation no injury can be done the appellant, for the two actions cover the whole of its property. The full market value of the entire property is the extent of the right of appellant. By consolidation this market value could be ascertained as a whole, thereby merging into the value of the entire property, tedious questions relating to severance damages. Appellant may not complain; the whole is equal to the sum of its parts and no more. The measure of damages applied was as though the fee were being taken in both instances. The reversionary interest in the part taken for street purposes, if of any value, still remained to appellant. Appellant may not be allowed to say that injury has resulted to it because, perchance, if the actions had not been consolidated, its severance damages, plus the market value of the individual portions of the tract, might have exceeded the market value of the tract as a whole.

Neither is appellant in a position to question the ruling of the court in allowing the so-called structural value of the building to be shown by it and, after so doing, limiting its purpose to corroboration of the evidence of market value and the formation of a basis for hypothetical questions to be propounded to experts upon the question of market value. The general rule is against the admission of this class of evidence for any purpose. The market value of the land, together with the improvements thereon, viewed as a whole and not separately, is the general rule. (*Vallejo, etc.,* v. *Home Savings Bank,* 24 Cal. App. 166 [140 Pac. 974].) Exceptions to this general rule might be allowed where, under peculiar circumstances not here present, as by reason of the nature of the improvement itself, no other criterion would be appropriate for establishing the market value of the property other than the structural value or the reconstruction

cost. The case of *Joint Highway Dist. No. 9* v. *Ocean Shore R. R. Co.*, 128 Cal. App. 743 [18 Pac. (2d) 413], seems to be an illustration of the exception.

The observations just made dispose also of appellant's further contention that the land should be viewed, valued as vacant property alone, its market value determined, and it should then be ascertained to what extent, if any, the improvements enhance such value. Clearly this is not allowable under our decisions construing section 1248, subdivision 1, of the Code of Civil Procedure.

We also deem it unnecessary to pass upon the fifth question urged by appellant, that it was error to strike out all of the testimony of a witness on market value, upon a showing that such testimony was based in part on an element not proper to be considered by him in forming his expert opinion. This is so, because we have held that error was committed in holding that the element referred to should not be considered; hence the question becomes immaterial at this time.

Question six relates to the qualification of an expert on reproduction cost of the "processing equipment", a subject of doubtful materiality and, moreover, a matter over which the trial court had a wide discretion. We need not express an opinion upon this particular situation. Question seven relates to the offer of proof of the net profits that may be lost to appellant by reason of the time that will be taken to dismantle and remove the machinery from the building and set it up again on the new location. This is not a proper element of damage and, furthermore, under the ruling we have made, the question practically loses its significance. Question eight, relating to a failure to find on alleged material issues tendered by the pleadings, is answered by our holding that it was proper for the court to make the order consolidating these causes.

The judgment is reversed.

Thompson, J., Shenk, J., Curtis, J., Langdon, J., and Waste, C. J., concurred.

Seawell, J., being absent, did not participate herein.

Rehearing denied.