[Civ. No. 2484.   Fourth Dist.   May 11, 1942.]

LOUISE F. BELL, Appellant, v. BANK OF PERRIS (a Banking Corporation) et al., Respondents.

Oliver P. Ensley and Henry O. Wackerbarth for Appellant.

William A. Wood for Respondents.

SCHOTTKY, J. pro tem.—This is an appeal from a judgment rendered in favor of respondents in an action for the removal of three deep well centrifugal pumps from a ranch property during the period of redemption in a mortgage foreclosure action. The trial court found that the pumps had not become affixed to the real property so as to pass title to the appellant, who was the mortgagee and also the purchaser at the foreclosure sale. The sole question to be decided upon this appeal is whether or not the trial court erred in concluding that the pumps in question were not ·fixtures.

On October 14, 1928, Horace R. Moses and wife, the predecessors in interest of respondents Long, borrowed $21,500 from appellant and executed a mortgage securing said sum on 215 acres of land near Perris, in Riverside County. An action to foreclose said mortgage was commenced on October 8, 1935, and on June 1, 1936, a commissioner's certificate of sale of the mortgaged property was issued to appellant. No redemption occurring, a commissioner's deed was issued on July 31, 1937.

In order to understand the factual background, it is necessary to set forth a few facts in addition to those set forth in the findings hereinafter set forth. Respondents Long acquired an interest in said ranch in 1920, and became the sole owners in 1931. The ranch was used for growing alfalfa and the irrigation water was pumped from deep wells. At the time of the execution of the mortgage there were two wells on the property equipped with pumps, one of which was replaced in 1929 by one of the pumps herein involved. A third well was drilled in 1930 and equipped with a Johnston turbine pump. All of the pumps here involved were purchased on conditional sales contracts but were fully paid for in 1930 or prior thereto.

The trial court found that said land was in a semi-arid region and required irrigation in order to be farmed advantageously, and that the only practicable means of obtaining

irrigation for said land is by drilling wells and the installation of adequate pumping machinery and equipment; that said land had for more than 15 years been used chiefly for growing alfalfa and had been graded and leveled and equipped with concrete pipe lines, two-thirds of said land having been so prepared prior to the execution of the mortgage and one-third thereafter, and that the water for the irrigation of said land was obtained from wells which had been drilled thereon.

The findings of the court then proceed:

## "II.

"That it is true that on or about October 8, 1935, and ever since then, water for irrigation of said land was obtained and only obtainable from three wells on said land, drilled to depths varying from 255 to 300 feet, and equipped with steel casing; that each well was equipped with a vertical centrifugal turbine pump; that each pump was assembled, but not specifically designed, to meet the conditions of each well wherein placed; that each pump had about 195 feet of steel column of about 7 or 8 inches diameter, with steel bowls at lower end to raise water and with shafting in tubing attached to bowls.

## "III.

"That it is true that there was attached to the upper end of each of said columns, a pump head of appropriate size and with oil lines, bearings and other usual accessories, all comprising such pump, appropriate for such use and weighing about 5990 pounds.

## "IV.

"That it is true that each of said columns hung freely in said wells from said pump heads, without any braces, bolts or attachments of any sort, and that each of said pump heads rested upon a concrete foundation imbedded in the soil. That it is not true that any of said pump heads were sustained in place by said foundations in the sense that they adhered or were attached thereto, or were imbedded therein, or were fixtures thereof or of said real property. That the pump head of each pump rested on a concrete foundation imbedded in the ground, constructed for the particular purpose of providing a firm, strong, steady and accurate resting place for the pump, and sustaining its entire weight of approximately fifty-nine hundred ninety pounds (5990).

## "V.

"That it is true that each pump and accessories thereof, was constructed and installed to raise subterranean water above the ground and to discharge it into a concrete weir for use on said real property; that each of said weirs was imbedded in the soil and a part of the water distribution system of said real property.

## "VI.

"That it is not true that any of said pumps was affixed or attached to a or imbedded in any of said weirs by steel pipes or bolts. That it is true that each pump was connected to a weir by means of two pipes. That said two pipes were connected with each other by means of a Dayton coupling. That the pipe which was fastened firmly into a weir was separate and distinct from the pump head to which the other pipe was fastened firmly. That the two pipes were sufficiently fastened to each other by said Dayton coupling to enable water to be raised in said weirs to a height of from 8 to 12 feet and resist pressure without leakage.

## "VII.

"That it is not true that any of said pumps was attached or affixed by iron pipes or otherwise, with a vat imbedded in the soil or with said real property.

## "VIII.

"That it is true that each pump was enclosed in a pump house, but was removable therefrom; that said pump houses were readily removable.

## "IX.

"That it is not true that any of said pumps, or accessories, or equipment, were intended to be or were installed, or attached, or affixed to said premises, at any time, or at all.

"That the parts of the Dayton Couplings used on the pumps included a steel sleeve between twelve and eighteen inches in length, having an inside diameter sufficient to allow the steel sleeve to slip over the outer ends of the discharge pipe and of the pipe running into the weir, each end of the sleeve being fitted into a flange, with the periphery of both flanges bored with six eyes spaced in each flange to correspond with the eyes of the opposite flange, the inner circumference of both flanges being grooved to fit over a gasket around the

circumference of the pipe end over which the Dayton Coupling flange was to be set, and the Dayton Couplings being provided with steel bolts headed and threaded and inserted into the corresponding eyes of the flanges so the bolts would run parallel with the axis of the steel sleeve.

## "X.

"That it is true that on or about March 1, 1937, defendant bank, without the consent or knowledge of plaintiff, entered said land, removed a portion of each pump house, and withdrew and removed each of said pumps and equipment from the wells, respectively. That it is also true that defendants, Leon C. Long and Louise Davis Long, consented to and had knowledge of each of said acts of said defendant bank, but did not connive with defendant bank in such acts."

It appears from the record without contradiction that there were three reservoirs on the land into which the water pumped from the wells could be pumped, and that the concrete pipe lines were interconnected and attached to and could be used with each of the pumps, and that after the water left the pumps it went into a concrete weir box which was imbedded in the soil and connected to the pipe lines by a Dayton coupling which joined the pipe to the pump, and the pipe to the weir box. The findings and the photograph of said Dayton coupling, introduced as an exhibit, shows said connection to be a substantial and firm connection between the pump and the remainder of the irrigation system. The respondent Bank of Perris removed the pumps from the property on March 1, 1937, after having received a chattel mortgage on the pumps and a bill of sale thereof from the respondent Long. In order to remove said pumps it was necessary to remove the roof and part of the sides of each pump house and to lift the pump out with a block and tackle.

A witness called by respondents explained how he had installed all three of the pumps as follows:

"Q. In the beginning, just explain to the court in your own way just how you installed and put these water boxes in the top part of the casing? A. Well, we put the pump in, the column and bowls and the column, and when we came down to make up the length on the head, then we have to take measurements to be sure that it is all right. Then we put that make-up connection on, to which the head is attached to the water box. Then we pick the whole thing up and let it

down to within, oh, I always plan on setting it down within an inch of the foundation. Then I take some soft wood blocks approximately an inch thick, and I put them under different points of the pump, under the flange of the water box, and then I equalize the whole thing up so that the pump itself hangs plumb in the well; and when I get that done, I leave it hang right there, and put the cement under it, make up a grout, taking about half and half sand and cement, just make it damp, and poke it under there like you would grout anything; and with these soft wood blocks in there, after we do that, we take the weight off the line and let it set there; and then as the cement hardens around the soft wood blocks, the weight of the pump draws down, and it equalizes and takes the weight and becomes solid and plumb in the well.''

Section 657 of the Civil Code defines property to be either: ''1. Real or immovable; or 2. Personal or movable.''

Real or movable property consists of: ''1. Land; 2. That which is affixed to land; 3. That which is incidental or appurtenant to land; 4. That which is immovable by law . . .'' (Civ. Code, § 658.)

Personal property is defined as ''Every kind of property that is not real. . . .'' (Civ. Code, § 663.)

The law relating to fixtures recognizes that under certain circumstances personal property becomes a part and parcel of real property and thereafter assumes the status of real property. Section 660 of the Civil Code reads as follows:

''A thing is deemed to be affixed to land when it is attached to it by roots, as in the case of trees, vines, or shrubs; or imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws; except. . . .''

With reference to section 660 of the Civil Code our Supreme Court has stated: ''This section of the code is simply a rule for general guidance, concerning itself more with the ultimate than with probative facts.'' (*Gosliner* v. *Briones,* 187 Cal. 557 [204 Pac. 19].) ██ The relationship between the parties to the controversy must be taken into consideration in determining whether an article of personal property has become affixed to the real property. Personal property which would assume the status of real property, if affixed thereto by the owner or mortgagor, would not assume the status of real property if affixed thereto by a tenant. This rule is clearly

stated by our Supreme Court in the case of *R. Barcroft & Sons Co.* v. *Cullen,* 217 Cal. 708 [20 P. (2d) 665], where it is said (pp. 711-712):

"Whether or not an article annexed to the real property is a fixture is a question of fact to be determined upon the evidence in the particular case. (*Gosliner* v. *Briones,* 187 Cal. 557 [204 Pac. 19]; *Bianchi* v. *Hughes,* 124 Cal. 24 [56 Pac. 610].) The question is determined not only by the manner in which the article is annexed to the realty, but also by the relationship between the parties to the controversy. (12 Cal. Jur. 569, § 8.) . . . there can be no doubt that if the action were between a vendor and vendee, or between a mortgagor and mortgagee, the service and comfort stations erected by appellant would be held to be fixtures. . . . There can be no doubt that as between landlord and tenant, in the absence of agreement, such buildings as are here involved would be deemed to be trade fixtures and removable by the tenant."

In the same case the court said:

"Thus, as between the vendor and vendee, or mortgagor and mortgagee, the rule in reference to fixtures is construed most strongly in favor of the vendee or mortgagee."

In the case of *San Diego Trust & Savings Bank* v. *San Diego County,* 16 Cal. (2d) 142 [105 P. (2d) 94, 133 A. L. R. 416], a very recent case on the question of fixtures, decided since the judgment in the instant case was entered, the court stated the test to be applied as follows:

". . . the three tests which have often been used by this court in determining whether or not an article is a fixture— namely: (1) the manner of its annexation; (2) its adaptability to the use and purpose for which the realty is used; and (3) the intention of the party making the annexation. (*Lavenson* v. *Standard Soap Co.,* 80 Cal. 245, 250 [22 Pac. 184, 13 Am. St. Rep. 147]; *Hendy* v. *Dinkerhoff, supra,* [57 Cal. 3 (40 Am. Rep. 107)]; *Western Union Tel. Co.* v. *Modesto Irr. Co., supra* [149 Cal. 662 (87 Pac. 190, 9 Ann. Cas. 1190)]; *Gosliner* v. *Briones,* 187 Cal. 557 [204 Pac. 19]; *Jahnke* v. *Jahnke,* 81 Cal. App. 387, 391 [253 Pac. 752]; *County of Los Angeles* v. *Signal Realty Co.,* 86 Cal. App. 704, 711 [261 Pac. 536].) . . . .

"As between private parties such as those bearing the relationship to each other of landlord and tenant, or vendor and vendee under a conditional sales contract, their mutual intention as to whether an article is a fixture and part of the

realty or is personalty is the controlling factor. As to third persons who are not parties to any such private agreements, however, the intent which controls is not a secret hidden intent but that manifested by the physical facts, giving due consideration to the status of the party by whom the articles have been installed. (*Southern California Tel. Co.* v. *State Board of Equalization, supra* [12 Cal. (2d) 127, 132 (82 P. (2d) 422)]; *M. P. Moller, Inc.* v. *Wilson*, 8 Cal. (2d) 31, 37 [63 P. (2d) 818]; *City of Los Angeles* v. *Klinker*, 219 Cal. 198 [25 P. (2d) 826, 90 A. L. R. 148]; *Gosliner* v. *Briones, supra; Oakland Bank of Savings* v. *California Pressed Brick Co.*, 183 Cal. 295 [191 Pac. 524]; *Lavenson* v. *Standard Soap Co., supra.*)''

In the case of *Southern California Telephone Co.* v. *State Board of Equalization*, 12 Cal. (2d) 127 [82 P. (2d) 422], the court stated, at p. 134:

''It is settled that in disputes between private persons the intention of the parties is controlling in determining whether an article is a fixture and part of the realty or is personalty. In *M. P. Moller, Inc.* v. *Wilson*, 8 Cal. (2d) 31, 37 [63 P. (2d) 818], the rule is thus expressed: 'This court has recognized the test of intention to make the article a permanent addition to the realty as manifested by the physical facts, and has accepted the character of the annexation and the use for which the article is designed as subsidiary elements employed for the purpose of testing the intention of permanency. (*City of Los Angeles* v. *Klinker*, 219 Cal. 198 [25 P. (2d) 826, 90 A. L. R. 148]; *Gosliner* v. *Briones*, 187 Cal. 557 [204 Pac. 19]; *Oakland Bank of Savings* v. *California Pressed Brick Co.*, 183 Cal. 295 [191 Pac. 524]; *Lavenson* v. *Standard Soap Co.*, 80 Cal. 245 [22 Pac. 184, 13 Am. St. Rep. 147].) Thus whether an article is or was physically affixed to the building is only one of the criteria in determining whether there was an intention to make it a permanent accession to the real property.'

''By definition in section 660, Civil Code, a thing becomes a fixture when it is 'permanently attached' to the realty, and permanence has reference to intent. By virtue of the importance of intent, a lessee may be permitted to remove an article installed by him and constituting a trade fixture.''

In the case of *M. P. Moller, Inc.* v. *Wilson*, 8 Cal. (2d) 31 [63 P. (2d) 818], it is said at pages 37 and 38:

''We find a growing tendency in the decisions to modify the common-law test of technical affixation to the structure.

In one direction the modification as noted in the test cited and as illustrated by the decision in *City of Los Angeles* v. *Klinker*, 219 Cal. 198 [25 P. (2d) 826, 90 A. L. R. 148], tends to include as fixtures articles such as machinery whose permanent annexation is not manifested by the use of bolts, screws and the like, but which are of such weight and nature that the mere retention in place by gravity is sufficient to give them the character of permanency and therefore affixation to the realty . . . .

"Annexation by weight and gravity, therefore, is not always alone a sufficient indication of an intent to make the article a permanent fixture and part of the realty. It must also appear from the nature of the chattel that if used for the purpose for which it was designed it would naturally and necessarily be annexed to and become a permanent and integral part of some realty; in other words, that it would become essential to the ordinary and convenient use of the property to which it was annexed."

In the case of *Broadway Improvement & Investment Co.* v. *Tumansky*, 2 Cal. (2d) 465 [41 P. (2d) 553], the trial court found that the gas steam radiators in an apartment house were not attached to the floors except that each radiator was connected by means of a "slip joint threaded union and flange" to a gas pipe in each room and the lobby, and could not be removed except by unscrewing it with a wrench, and held that said radiators were not fixtures. Upon appeal the Supreme Court reversed the judgment upon that phase of the case, saying on page 469 of the opinion:

"It is equally obvious that the finding with respect to the gas steam radiators is sufficient to compel us to declare that they were also attached to the building in such a way as to become fixtures and a part of the realty. In the case of *Dauch* v. *Ginsburg*, 214 Cal. 540 [6 P. (2d) 952], the heating fixtures were 'attached to the rough plumbing by means of slip joint threaded unions and flanges' and this court determined that they had become fixtures and that their removal would substantially damage and injure the property. It further said: 'The plumbing and heating fixtures are permanent in character, and absolutely essential to the purpose for which the building was constructed. The hotel building would not be a hotel building without those fixtures.' The same conclusion was reached in the other case, also

involving gas steam radiators, and the trial court's judgment was reversed."

In 26 Corpus Juris, p. 661, § 10, it is stated:

"Retention in Place by Gravity. Retention in place by gravity, without any fastening, has been not infrequently held to be insufficient, but the later cases usually regard this as sufficient, provided the intention to make the article part of the realty plainly appears and the article or structure is so heavy that it is as effectively kept in place by gravity as if it were fastened."

■ Applying the legal principles hereinbefore set forth to the facts of the instant case, as shown by the findings and the undisputed evidence, we believe that the trial court erred in holding that the three pumps involved in this action were not fixtures.

As we view the matter there can be no doubt that it was the intention of respondents Long to make said pumps a permanent part of said irrigation system and said alfalfa ranch. This is clearly shown by the manner of their installation—(1) the placing of each pump-head upon a concrete foundation imbedded in the ground, which foundation was, according to the findings of the court, "constructed for the particular purpose of providing a firm, steady, and accurate resting place for the pump and sustaining its entire weight of approximately 5990 pounds"; (2) the cement or cement grouting filled in and around the pump-head where it rested upon the concrete block; (3) the joining together of the pipe from the pump-head to the pipe extending from the weir box by a Dayton coupling consisting of certain pieces of steel joined together by bolts, the weir box being a large concrete box from the bottom of which concrete pipe lines run out through various parts of the ranch, these pipes being used to carry water from the weir boxes to one or more of the reservoirs or to irrigate the alfalfa directly from the pipe lines; (4) the enclosing of each pump in a specially constructed pump-house from which it could only be taken by removing part of the sides and the roof; (5) and the fact that it at once became and was an integral part of an interconnected irrigation system without which the alfalfa ranch could not be operated. There is not a word of testimony from respondents Long or anyone else that there was any other intention.

As was said in 11 R. C. L., p. 1062, § 6:

". . . But the test of intention is to be given a broad and comprehensive signification. It does not merely imply the secret action of the mind of the owner of the property, nor need it be expressed in words, but is to be inferred from the nature of the article affixed, the relation and situation of the party making the annexation, the structure and mode of annexation, and the purpose or use for which the annexation has been made; which, obviously, suggests that the other tests are really part of this comprehensive test of intention, and that they derive their chief value as conspicuous evidence of such intention."

Furthermore, the manner of the installation of the pumps and the manner in which they were used, as hereinbefore set forth, clearly shows that they meet the test of fixtures as to annexation and adaptability, as required by the authorities hereinbefore referred to.

Respondents seek to avoid the force of the authorities cited by arguing that the pumps were purchased under conditional sales contracts, and that when installed they had on each of them a plate which stated that the "title to this machinery is vested in the Johnston Pump Co. until fully paid for in money, and under the sales contracts thereon the said machinery cannot nor shall it become a part of the real estate or property wherever it is located." Respondents argue that such clauses in the conditional sales contracts and on the plates on the pumps, show that it was not the intention of the pump company nor of respondents Long that said pumps be affixed to the land. In the instant case all three pumps were paid for within a short time after they were installed and seven years before they were removed by the respondent bank.

It is true that by such a reservation a conditional sales vendor would have the right to remove the pumps if the purchase price were not paid, and that the authorities recognize such right. But the general rule is, as stated in 26 Corpus Juris, p. 678, § 39:

"Conceding that the article annexed retains its chattel character by reason of the agreement, it loses such character as soon as the separate interest of the beneficiary under the agreement is extinguished, as by his transfer of the article to the landowner, his relinquishment of his claim or the acquisition by one person of both the land and chattel."

In the leading case of *Planters' Bank* v. *Lummus Cotton*

*Gin Co.*, 132 S. C. 16 [128 S. E. 876, 41 A. L. R. 592], the Supreme Court of South Carolina, in stating the general rule, said:

"It is contended by the defendant that the machinery cannot be considered fixtures, for the reasons that in the contract of purchase the vendee Clinkscales agreed that the machinery would not be 'a fixture to any realty,' and that after it had been installed the vendee executed a chattel mortgage upon it in favor of the defendant.

"It is not uncommon for the seller of machinery, under a reservation of title contract, to insist upon an agreement by the buyer that it shall not be deemed a fixture and such stipulations are generally valid; the machinery retaining its character as personal property. But it is universally and logically held that such a stipulation is for the benefit of the seller, and that when the buyer's obligation to him has been discharged, it is no longer operative."

Respondents point to the fact that the pumps were removed on one occasion for the purpose of being overhauled and then put back in place, the manner of removal being accomplished by substantially the same means as when the pumps were removed by respondent bank, and respondents contend that this is some evidence that the installation of the pumps was not intended to be permanent.

This contention is fully answered by the following language from the case of *San Diego Trust & Savings Bank* v. *San Diego, supra:*

"As appears hereinabove, vault doors are attached to vaults by means of screwing the 'rear' flange into place, hanging the door, then attaching the whole securely to the vault by means of cement.

"The mere fact that said doors can be removed without material damage to the vaults by chipping away with a chisel, jack hammer, or compressed air hammer, the cement grouting which attaches them to the vaults, does not alone establish their character as articles of personalty. A door or window in an ordinary dwelling house can be removed with very little damage to the realty. It also may be replaced by one of different design or by a new one if the former should become broken or defective, but no one would contend that either was not a part of the realty by reason of these facts alone.

"The existence or period of use of a vault door is measured

by the life of the building to which it is annexed unless it becomes obsolete or mechanically defective. In order to make an article a permanent accession to the land its annexation need not be perpetual. It is sufficient if the article shall appear to be intended to remain where fastened until worn out, until the purpose to which the realty is devoted has been accomplished or until the article is superseded by another article more suitable for the purpose. (26 C. J. 657, § 6)."

Other points discussed in the briefs do not in our opinion require discussion.

It follows from the foregoing that the trial court erred in holding that the three pumps in controversy were not fixtures.

Under the allegations of the complaint and those findings supported by the evidence it does not seem possible for plaintiff to recover judgment against Mr. and Mrs. Long. If there was a conversion of the property it was by the bank and not by the individual defendants.

The portion of the judgment in favor of Leon G. Long, also known as Leon C. Long, and Louise Davis Long is affirmed. The portion of the judgment in favor of Bank of Perris is reversed.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing was denied June 10, 1942, and respondent Bank of Perris' petition for a hearing by the Supreme Court was denied July 6, 1942.