[Civ. No. 1020. Fifth Dist. July 1, 1970.]

CITY OF SAN JOAQUIN, Plaintiff and Appellant, v.
STATE BOARD OF EQUALIZATION, Defendant and Appellant.

**COUNSEL**

Wilbur K. Kessler for Plaintiff and Appellant.

Thomas C. Lynch, Attorney General, Ernest P. Goodman, Assistant Attorney General, and Edward P. Hollingshead, Deputy Attorney General, for Defendant and Appellant.

OPINION

GARGANO, J.—This litigation presents a controversy between the City of San Joaquin, hereafter referred to as San Joaquin, and the State Board of Equalization, hereafter referred to as the Board, as to the manner in which the Board allocates sales taxes imposed by cities and counties on retail sales of deep well agricultural pumps. The background facts are undisputed and essentially are as follows:

San Joaquin has adopted a sales tax ordinance pursuant to the Bradley-Burns Uniform Local Sales and Use Tax Law (part 1.5 of div. 2, § 7200 et seq., Rev. & Tax. Code), which imposes a .91 percent sales tax on the gross receipts derived by city retailers from the sale of tangible personal property. It has also contracted with the Board for the administration of the ordinance and the collection of the sales taxes imposed thereunder.

The West Side Pump Company is engaged in the business of selling and installing deep well agricultural pumps. It has a permanent place of business in San Joaquin consisting of an office area, a showroom area, shop area and storage yard. The company conducts all of its pump business from the San Joaquin plant but installs the pumps at job sites in Fresno, Kings, Tulare and Madera Counties.

Until the second quarter of 1965, the West Side Pump Company reported its sales as occurring in San Joaquin; thus, San Joaquin was allocated 91 percent of the combined sales taxes imposed by San Joaquin and the County of Fresno on the gross receipts derived by the company from these sales. In 1965, under Administrative Ruling No. 11 (18 Admin. Code, § 1921),[1] the Board classified as construction contractors all retail dealers of deep well agricultural pumps; the pumps were classified as fixtures. The Board then ordered the West Side Pump Company to comply with

---

[1]Administrative Code section 1921 reads in pertinent part:

"(1) The term 'contractor' as used herein includes both general contractors and subcontractors and includes contractors engaged in such building trades as carpentry, bricklaying, cement work, steel work, plastering, sheet metal work, roofing, tile and terrazzo work, electrical work, plumbing, heating, air conditioning, painting and interior decorating.

"(2) The term 'construction contract' as used herein means a contract for erecting, remodeling, or repairing a building or other structures on land and includes lump-sum, cost-plus, and time-and-material contracts. The term 'construction contract' does not include a contract for the sale and installation of machinery or equipment.

"(3) . . . . . . . . . . . . . . . .

"(4) The term 'fixtures' as used herein means things which are accessory to a building and which do not lose their identity as accessories when placed or installed."

Administrative Ruling No. 2206 and report the sales of its deep well agricultural pumps to the county in which they were installed.[2]

On April 20, 1966, San Joaquin filed this action in the Superior Court of Fresno County for declaratory relief. The city challenged the Board's power to classify the West Side Pump Company as a construction contractor and declare that the pumps which it sells and installs are fixtures. It also attacked the legality of the "pooling procedure" adopted by the Board in allocating local revenues from construction contracts.

After court trial, the trial judge concluded that the West Side Pump Company is not a construction contractor, that the deep well agricultural pumps the company sells and installs do not become fixtures upon installation, and that ruling 2206 is inapplicable to the retail sales made by this company. He also concluded that the pooling procedure adopted by the Board for the allocation of sales and use tax revenues was proper and did not unconstitutionally deprive the city of its tax revenues.

Before directing our attention to the appeals, an understanding of the basic legislative purpose of the Bradley-Burns Uniform Local Sales and Use Tax Law, and the reasons for the Board's adoption of Administrative Ruling 2206, is essential.

Initially, the power to impose sales and use taxes at the local level was reserved to cities (Gov. Code, § 37101).[3] However, in 1955 the Legislature adopted the Bradley-Burns Uniform Local Sales and Use Tax Law, and for the first time also conferred this power on counties (Rev. & Tax. Code, § 7201). The purpose of the law was to provide an additional source of tax revenue for counties, to encourage uniform and integrated sales and use tax programs throughout the respective counties, to require a city retailer to pay only one combined sales and use tax (with the city retaining all of the tax imposed under the city ordinance and the county

---

[2] (§ 2206 has been amended and renumbered § 1806 effective in February, 1970; it is now to be found in 18 Cal. Admin. Code, § 1806.) Ruling No. 2206 read in part: "The jobsite is regarded as a place of business of a construction contractor or subcontractor and is the place of sale of 'fixtures' furnished and installed by contractors or subcontractors. The place of use of 'materials' is the jobsite. Accordingly, if the jobsite is in a county having a state-administered local tax, the sales tax applies to the sale of the fixtures, and the use tax applies to the use of the materials unless purchased in a county having a state-administered local tax and not purchased under a resale certificate. If the jobsite is in a county without a state-administered local tax, state-administered local sales tax will not apply to the sale of the fixtures even though the contractor's principal place of business is in a county with such a tax."

[3] A sales tax is an excise tax imposed on the privilege of conducting a retail business and is measured by gross receipts from retail sales of tangible personal property (*City of Pomona* v. *State Board of Equalization,* 53 Cal.2d 305 [1 Cal.Rptr. 489, 347 P.2d 904]).

receiving the difference, if any, between the city tax and the county tax), and to make available to the cities and counties the distinct advantage of having the integrated sales and use tax program administered and the taxes collected by the state. As our Supreme Court succinctly stated in *Geiger* v. *Board of Supervisors,* 48 Cal.2d 832, 837 [313 P.2d 545]: "The act contemplates an integrated, uniform system of city and county sales and use taxation. The counties are given authority to impose sales and use taxes as a means of raising additional revenue, and the cities are furnished with a plan of state administration which will relieve them from operating collection systems of their own. The taxpayers will receive the benefit of a scheme which will free them from the burden of complying with differing regulations of state and local taxes, avoid the necessity of making payments and reports to several governmental bodies, and permit all auditing to be done by a single agency. The method devised provides for the equitable sharing of revenue by a county and the cities within its boundaries. It is intended that there will be concurrent action by a county and the cities in the county for the purpose of adopting an integrated system of local sales and use taxation, and the city ordinances adopted under the authority of the act are apparently made contingent upon the existence of a county tax ordinance. Retailers are entitled under the statute to credit against the county tax the amount of sales and use taxes due to the city in which the business is located, provided the city tax is levied under an ordinance which incorporates certain specified provisions. A city system adopted pursuant to the act is substantially the same as that prescribed for the county and the state, and the city tax, like that of the county, is to be administered by the State Board of Equalization."

Thus, to effectuate an integrated sales and use tax program under the uniform law, a county must first adopt an ordinance imposing a one percent sales and use tax throughout the county, which ordinance must, inter alia, provide that city retailers shall receive as a credit against the county tax, the amount of any sales and use tax due to the city in which the retailer's place of business is located. Then, each city within the county wishing to participate must adopt an ordinance conforming with the requirements of the Bradley-Burns Uniform Local Sales and Use Tax Law and imposing a sales and use tax of one percent or less within the city. Finally, the local governments must contract with the Board to perform all functions incident to the administration or operation of their respective ordinances. And, because the Board must return sales taxes to the county or city under whose ordinance the tax is imposed, the Board is authorized to formulate rules governing sales of tangible personal property made by retailers having more than one place of business. In this

connection, Revenue and Taxation Code section 7205 provides, in part: "For the purpose of a sales tax imposed by an ordinance adopted pursuant to this part, *all retail sales are consummated at the place of business of the retailer.* . . . In the event a retailer has no permanent place of business in the State or has more than one place of busines, the place or places at which the retail sales are consummated for the purpose of a sales tax imposed by an ordinance adopted pursuant to this part shall be determined under rules and regulations to be prescribed and adopted by the board." (Italics added.)

On May 1, 1956, the Board, pursuant to its rule-making power, and for the purpose of allocating sales and use taxes imposed by local ordinances, distinguished between over-the-counter sales of tangible personal property and fixtures installed by persons defined as construction contractors under ruling 11.[4] In the case of over-the-counter sales, the store where the clerk concludes the sale is the place of business under Revenue and Taxation Code section 7205, even though the property is delivered elsewhere (*City of Pomona v. State Board of Equalization,* 53 Cal.2d 305 [1 Cal.Rptr. 489, 347 P.2d 904]). But, as to fixtures installed by construction contractors, the Board adopted Administrative Ruling 2206 which states that the job site is a place of business of a contractor, and the place where the sale of fixtures occurs. The Board apparently reasoned that because a construction contractor sets up a base of operation at the job site and remains there for a prolonged period of time, for the purpose of imposing a local sales tax, it is fair, logical and reasonable to make that job site the place of business where the sale of a fixture is consummated. Then, in 1965, presumably for the sake of uniformity, the Board made the classification challenged by San Joaquin in this litigation. It is from that part of the judgment nullifying the classification as it purports to apply to the West Side Pump Company, that the Board has appealed.

Under Administrative Ruling 11 (18 Cal. Admin. Code, § 1921), construction contractors are defined as contractors engaged in building trades, and a construction contract *"means a contract for erecting, remod-*

---

[4](18 Cal. Admin. Code, § 1921.) Ruling 11 was adopted by the Board a few years earlier in connection with the sales and use tax law to impose a sales tax on fixtures installed by construction contractors. In *General Elec. Co. v. State Board of Equalization,* 111 Cal.App.2d 180 [244 P.2d 427], the Board classified the General Electric Company as a construction contractor. The company had constructed and installed a turbine generator for the Pacific Gas & Electric Company. The court also held that the generator was a fixture and taxable as tangible personal property. In this connection, at page 187 of the opinion, the court stated: "Thus, in the construction of a structure the contractor is deemed to be engaged primarily in the sale of services, and is deemed to be a 'consumer' of the materials used. But in the construction, installation and sale of the fixture, the contractor is deemed to be a retailer of tangible personal property."

*eling or repairing a building or other structures on land"* other than *"a contract for the sale and installation of machinery or equipment."* Clearly, the West Side Pump Company is not engaged in a building trade; it is engaged in the business of selling and installing machinery and equipment. The company does not manufacture deep well agricultural pumps nor any of the components and does not drill wells or otherwise improve the real property on which the pumps are installed; the pumps are assembled at the company's plant in San Joaquin, are delivered to the job site in finished sections and are not designed for a particular well or well system.

It is also clear that the machinery which the West Side Pump Company installs does not become a fixture upon installation. The deep well agricultural pumps are not affixed to the land in a permanent fashion, have a useful life of only a few years, and upon installation do not become an integral part of an irrigation system; they are set in open spaces, usually on timbers, are held in place by gravity, and are movable; the pumps are often moved from one well to another, and for repairs are generally taken to the company's shop in San Joaquin. As Mr. Witkin puts it, a fixture is "a thing, originally personal property, but later *affixed or annexed* to realty, so that it is considered *real property."* (1 Witkin, Summary of Cal. Law (1960) Personal Property, § 23, p. 793.) And, under Civil Code section 660 a thing "is deemed to be affixed to land when it is . . . permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts or screws; . . ."

The Board relies on *Bell* v. *Bank of Perris,* 52 Cal.App.2d 66 [125 P.2d 829], and *General Elec. Co.* v. *State Board of Equalization,* 111 Cal.App.2d 180 [244 P.2d 427], and argues that deep well agricultural pumps are fixtures, "not impermanently installed machinery," primarily because the pumps are extremely heavy; they weigh about 60 pounds per foot and are installed in sections by a heavy crane mounted on the back of a large truck; repairs are made by lifting the entire unit out of the ground with heavy rigging, and the pumps remain in the same place until the farmer gets through with that particular well. Be this as it may, the pumps are not affixed to the realty, are movable and do not become a permanent or integral part of any well system; weight alone does not make a thing a fixture. And, according to the evidence, customarily in the trade and among the farmers in the area, deep well agricultural pumps which the West Side Pump Company installs are considered machinery and equipment; intent is an important factor in determining whether personal property becomes a fixture. (*Kruse Metals Mfg. Co.* v. *Utility Trailer Mfg. Co.,* 206 Cal.App.2d 176, 180 [23 Cal.Rptr. 514].)

The case of *Bell* v. *Bank of Perris, supra,* 52 Cal.App.2d 66, is distin-

guishable. In that case the trial court ruled that three deep well centrifugal pumps had not become affixed to an alfalfa ranch so as to pass title to appellant who purchased the ranch at a mortgage foreclosure sale. After reviewing the uncontradicted evidence, the appellate court understandably held that the pumps were fixtures because they were affixed to the land in a permanent manner, and upon installation became an integral part of an inter-connected irrigation system, without which the alfalfa ranch could not be operated. Each pump weighed about 5,990 pounds, was enclosed in a specially constructed pump house from which it could only be taken by removing part of the sides and roof, and was placed upon a concrete foundation embedded in the ground; the foundation was constructed for the particular purpose of providing a firm, steady and accurate resting place for the pump; and the cement or cement grouting was filled in around the pump head where it rested upon the concrete block. In addition, the pump heads were joined to an intricate pipeline system which made it possible to carry water from weir boxes to one or more of the reservoirs or to irrigate alfalfa directly.

In *General Elec. Co.* v. *State Board of Equalization, supra,* 111 Cal.App.2d 180, the evidence that a turbine generator became a fixture upon installation was overwhelming. The generator was fabricated especially for the buyer as an integral part of the buyer's steam electric plant and as a key piece of equipment, with all other equipment in the plant being related to it. Because of its size, it was shipped from New York to Kern County in 14 freight cars, and upon arrival was reassembled and housed in a building constructed and specially designed to fit that particular piece of equipment. The generator was attached to a concrete foundation with large bolts and cement and is expected to last indefinitely and to remain in place until obsolescence requires the plant to be scrapped or rebuilt.

The Board also argues that a "proper sharing" of local sales tax revenues requires that in the case of fixtures, the tax be delivered to the jurisdiction in which the job site is located. It asserts that the classification of deep well agricultural pump dealers as construction contractors is a general classification, is reasonable and promotes uniformity and simplicity of administration.

We are not persuaded by these arguments. As we have stated, the evidence conclusively proves that the West Side Pump Company is not a construction contractor and does not install fixtures. Thus, the classification, whether it is general or otherwise, is unreasonable and arbitrary insofar as it purports to apply to this company and deprives San Joaquin of substantial tax revenues it is entitled to receive under the Bradley-Burns Uniform Local

Sales and Use Tax Law. As the trial judge wisely observed, "[w]hile simplicity and uniformity may be desirable, such standards cannot be used to create an obvious inequity." To this observation, we add another comment. It is fundamental that an administrative agency may not usurp the legislative function, no matter how altruistic its motives are. It is one thing for the Board, under its rule-making power, to declare that a person who constructs a building or structure over a prolonged period of time has a place of business at the job site within the meaning of section 7205 of the Revenue and Taxation Code. It is entirely another matter for the Board to decree blatantly that a person who in actuality merely sells and installs machinery and equipment has a separate place of business at every location where the machinery and equipment are installed, and then attempt to justify its action by asserting that it did so mainly for the sake of simplicity and uniformity.

■ The Board's remaining contention is that the court erroneously denied its motion to join in the action the counties of Fresno, Kings, and Madera, and the incorporated cities situated therein. Briefly, it asserts that these counties and cities are necessary parties and should have been joined in the action, because, under the court's judgment, they will no longer share in taxes imposed on sales of the West Side Pump Company's deep well agricultural pumps even though the pumps are installed on job sites located within such cities or counties.

There is no merit to this contention. In this action, San Joaquin does not seek to recover any sales taxes allocated to any other city or county, nor has it asked for an accounting. It merely seeks a judicial determination as to its legal rights under the sales and use tax ordinance which it adopted pursuant to the Bradley-Burns Uniform Local Sales and Use Tax Law. It also seeks to test the validity of an administrative ruling which the Board made under its rule-making power. ■ It is elementary that the interpretation of ordinances and statutes is a proper matter for declaratory relief (*Walker* v. *County of Los Angeles,* 55 Cal.2d 626 [12 Cal.Rptr. 671, 361 P.2d 247]). When the action is brought against the very agency charged with the duty of administering or enforcing the law and merely challenges the validity of the agency's ruling, the plaintiff need not join everyone who may ultimately be affected by the court's decision. (See *Peabody Seating Co.* v. *Superior Court,* 202 Cal.App.2d 537 [20 Cal.Rptr. 792]; *Holtzendorff* v. *Housing Authority,* 250 Cal.App.2d 596 [58 Cal.Rptr. 886].)

■ We turn next to San Joaquin's appeal from that part of the judgment holding that the pooling procedure adopted by the Board for the allocation of local sales tax revenues imposed in connection with construc-

tion contractors is not unlawful. Briefly, all revenues received by the Board from the collection of local sales taxes imposed throughout a county are placed in a county-wide pool and are allocated by the Board to the taxing jurisdictions of that county on a quarterly basis. As to sales taxes imposed on over-the-counter sales, the revenues are allocated to each taxing jurisdiction in direct proportion to the reported sales attributable to such jurisdiction. But, as to sales taxes derived from construction contracts, the taxes are returned to the cities and the county on the same ratio as such cities and county receive revenues from over-the-counter sales for the same quarterly periods. Thus, each city is not allocated sales taxes imposed in connection with construction contracts, on a transaction for transaction basis; it receives its prorated share of all such taxes collected by the Board under a formula which is geared to the revenues the city receives from over-the-counter sales.

San Joaquin first contends that the Board's pooling procedure is a regulation within the meaning of the Administrative Procedure Act (ch. 4.5, part 1, div. 3, title 2, Gov. Code), and is invalid because it was not adopted in the manner prescribed by that act.

We do not agree. The challenged pooling practice is not a regulation, order or standard of general application which was adopted by the Board "to implement, interpret or make specific the law enforced or administered by it, or to govern its procedure . . . ." (Gov. Code, § 11371.) According to the evidence, it is merely a statistical accounting technique to enable the Board to allocate, as expediently and economically as possible, to each city which has joined the uniform sales and use tax program, its fair share of sales taxes collected by the Board on that city's behalf. Moreover, this accounting technique was worked out by the Board and the representatives of interested cities and counties and was made a part of the "standard" contract which San Joaquin ultimately signed, without protest or objection of any kind. Under the Bradley-Burns Uniform Local Sales and Use Tax Law, the Board is obligated to collect local sales and use taxes, and the manner to be used by the Board in allocating the taxes which it collects is an appropriate subject for contractual negotiation between the interested parties. The fact that San Joaquin may not have participated in the initial negotiations does not invalidate the contract's accounting procedure, particularly when the city did not object to the provision when it signed the contract. The case of *Del Mar Canning Co.* v. *Payne,* 29 Cal.2d 380 [175 P.2d 231], is distinguishable, and no further comment is necessary.

San Joaquin also attacks the pooling procedure on the ground that it violates article XI, section 13 of the California Constitution. According to the city, in failing to allocate taxes levied by cities in connection with

construction contracts on a transaction for transaction basis, the Board is giving taxes belonging to one local jurisdiction to another local jurisdiction.

Admittedly, under the pooling procedure adopted by the Board, San Joaquin is not allocated the exact amount of sales taxes which it imposes in connection with construction contracts performed within its boundaries; in this sense at least, San Joaquin's sales taxes are allocated to other jurisdictions. However, San Joaquin also shares in the sales tax revenues of other cities under a formula designed to give each city its fair share of all sales taxes collected throughout the county in which the city is located. In addition, by having its sales and use tax ordinance administered, and the sales and use tax collected by the Board, San Joaquin has gained a tremendous economic advantage. San Joaquin, therefore, has not necessarily sustained a loss of tax income from the Board's accounting practice nor has the Board interfered with the city's tax levying powers or its tax revenues within the prohibition of article XI, section 13. Significantly, San Joaquin has offered no evidence to prove that it has actually sustained a loss of tax revenues by virtue of the Board's accounting technique. San Joaquin was not required to join the uniform sales tax program. It was free to adopt a sales and use tax ordinance under Government Code section 37101 and to administer this ordinance and collect its own sales and use taxes. In fact, as we have stated, one of the main incentives offered by the Legislature to the cities to induce them to join the uniform program is the distinct economic advantage of having their sales and use tax ordinances administered, and the taxes collected, by the state. But, to foist upon the Board the duty of returning the taxes collected to each city on a transaction for transaction basis would destroy this very economic advantage. Because the pooling procedure is in reality an accounting technique which is reasonable, subserves the interests of all cities and counties and does not, in actuality, deprive any city or county of its revenues, it is not violative of article XI, section 13, of the state Constitution.

The judgment is affirmed.

Stone, P. J., concurred.