[S. F. No. 15946. In Bank.—September 2, 1938.]

SOUTHERN CALIFORNIA TELEPHONE COMPANY, (a Corporation), Petitioner, v. STATE BOARD OF EQUALIZATION, etc., et al., Respondents.

128

Alfred Sutro, Francis N. Marshall and Pillsbury, Madison & Sutro for Petitioner.

U. S. Webb, Attorney-General, John J. Dailey, Deputy Attorney-General, Ray L. Chesebro, City Attorney (Los Angeles), and John W. Holmes, Deputy City Attorney, for Respondents.

SEAWELL, J.—Petition for writ of mandate to be directed to the State Board of Equalization. Since 1935 the property of telephone and telegraph companies, other than their franchises, is assessed by the State Board of Equalization. (Art. XIII, sec. 14, Const., as amended in 1933, effective January 1, 1935.) Upon the value as thus assessed cities, counties and other local taxing districts levy *ad valorem* taxes. The State Board of Equalization assessed the central office equipment of petitioner Southern California Telephone Company as improvements to realty for the fiscal year 1937–1938, with the result that taxes in the amount of approximately $36,000 have been levied against said property which would not have been charged against it if it had been assessed as personal property. The prayer of the petition is that the board be directed to correct its assessment by classifying said property as personal property and to transmit notice of the correction to the local tax officers.

The alternative writ of mandate was granted on December 16, 1937. As grounds for applying to this court for extraordinary relief by writ of mandate, petitioner alleged that to remit it to the remedy of payment of the additional taxes under protest and action thereafter to secure a refund would involve a multiplicity of actions, and that only by applying

to this court could a determination be had before the taxes became delinquent.

The hearing upon the return to the writ was not held until May 4, 1938. In the meantime petitioner had paid, under protest, the bulk of the taxes to which it objects to avoid penalties for delinquency, and it is to be inferred from petitioner's briefs that all said taxes have now been paid. The respondent board urges that by reason of this payment it would be an idle and ineffective act to grant petitioner the relief sought, that is, correction of the assessment, and that the remedy by claims and actions to recover the taxes is adequate. (Sec. 3804, 3819, Pol. Code.) Respondent board further points to the fact that the local tax officers by whom refunds must be made of taxes illegally collected are not parties to this proceeding. It also contends that after the time for hearing objections to the assessment has passed, it is without authority to reclassify property except where error appears from the "assessment book, or from maps, block books or other papers" of the board (sec. 3663c, Pol. Code), and that the error of classification herein, if any, does not thus appear.

Respondent board alleges in its answer, and petitioner admits, that the additional taxes of approximately $36,000 which have resulted from the classification of petitioner's office equipment as improvements to realty have been levied by only six taxing districts. Five of these districts are in Los Angeles County, the sixth, in which a tax of only $25.51 was levied, is in Orange County. Of the total of $36,623.08 additional taxes, $33,389.99 were levied in Los Angeles County on behalf of the Los Angeles County flood control district. The districts in question—flood control, sanitation and water districts—tax land and improvements to land, but not personalty.

Petitioner observes in its briefs that the determination of the propriety of the board's classification is of importance not only to it, but to its parent corporation, The Pacific Telephone and Telegraph Company, which owns central office equipment in other jurisdictions in the state, and, like petitioner, has been subject to additional taxes by reason of the board's classification. Petitioner contends that this court should order the correction of the assessment if it is erroneous

notwithstanding that since the issuance of the writ it has paid taxes under protest. The theory of petitioner is that upon a determination of this proceeding in its favor the local authorities in the jurisdictions where it has made tax payments will allow petitioner's claims for refunds, or if it is required to resort to actions, the nature of the central office equipment will be concluded by the decision of this court in the instant proceeding. It also urges that a determination here will indicate to the board the course to be followed by it in future years. (*American Securities Co.* v. *Forward,* 220 Cal. 566, 571 [32 Pac. (2d) 343, 96 A. L. R. 1268]; *Union Safe Deposit Bank* v. *Menlo Park,* 3 Cal. (2d) 264 [43 Pac. (2d) 811].) If it is required to resort to actions brought in the lower courts a final determination cannot be had on appeal until the time for assessment and payment of taxes for one or more ensuing fiscal years has elapsed, with the consequent necessity of bringing additional suits to recover taxes based on these later assessments.

We are of the view that it is not necessary to consider the above arguments for the reason that a fatal objection exists as to the granting of the writ. The instant case on the facts alleged in the petition involves directly only the assessment of central office equipment in the six taxing districts wherein petitioner has been compelled to pay additional taxes of approximately $36,000 by reason of the board's classification. In the affidavits presented by it petitioner does not set forth a particular description of the equipment in its offices in said districts. In fact it does not give the names or location of said offices. Its descriptive matter is general, without reference to particular offices. The photographs of central office equipment filed with this court show with two exceptions equipment owned not by petitioner but by The Pacific Telephone and Telegraph Company. This lack of descriptive matter concerning the particular offices involved in this proceeding is accounted for by the fact that petitioner has submitted its case on the theory that the similarity of equipment is such that a uniform classification can be adopted for central office equipment without regard to the particular office in which it is located.

Desirable as a uniform classification may be in the interests of administrative expediency, we are of the view that upon

the showing made in this proceeding it cannot be held as a matter of law that equipment in all petitioner's offices is either personalty or realty. Large offices are located in specially designed metropolitan buildings, built and owned by the telephone company. In small communities equipment is often located in premises devoted to other purposes, as in a grocery store or lunchroom, in which the telephone company leases space. In such cases the switchboard may be approximately the size of an ordinary desk, and the other equipment occupies an insignificant space. Whether any of petitioner's offices in the taxing districts involved in this proceeding are of this type does not appear.

In the instant case, in view of the state of the record, it cannot be ascertained in which offices the equipment remains personalty, and in which it is an improvement to realty. It is not made to appear that the respondent board has incorrectly assessed petitioner's equipment in any office, since the nature of the equipment in the particular offices involved in not shown. In this situation a writ of mandate cannot be granted.

Between 1911 and 1935, public utilities paid to the state a tax on their operative property which was measured by a percentage of the gross receipts from operation. (Art. XIII, sec. 14.) In 1935 the respondent board for the first time assessed petitioner's property on an *ad valorem* basis. It assessed central office equipment as personalty in 1935 and 1936. The assessment of 1937, for the fiscal year 1937–1938, for the first time classified it as improvements to realty.

The term "improvements", as defined by section 3617, Political Code, for tax purposes, includes, "All buildings, structures, fixtures, fences, and improvements erected upon or *affixed to the land,* except telephone and telegraph lines." By section 660, Civil Code, the term "affixed to land" is defined as follows: "A thing is deemed to be affixed to land when it is attached to it by roots, as in the case of trees, vines, or shrubs; or imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws. . . . "

The petitioner's central office equipment is briefly described by it as including "all mechanical and electrical devices used

in making telephone connections—i. e., in making a connection for the duration of the conversation between the line of the calling party and the line of the party called—and includes that part of the subscriber lines and trunk lines which is within the central office". Central offices are of two kinds, those in which the equipment is manual, and those which have dial equipment.

The general description of equipment given by petitioner in its affidavits suggests its large offices. It describes first the manual type equipment. Switchboards are mounted in cabinet-like frames which rest on the floor. The frames of the switchboards are secured by means of bolts screwed into holes in the floor. Inside the switchboard contains a mass of wires. Main and intermediate distributing frames are of metal and are made secure by bracket members through which bolts are screwed into the floor and generally into the ceiling. Frames have several shelves each holding a mass of wires. Cables are made up of a bundle of small individual copper wires, and are described by petitioner "as the connecting links which carry subscriber lines from one piece of central office equipment to another". Cables are supported by cable racks or runways, which are iron frames usually suspended from the ceiling by bolts and also fastened to the framework of the distributing frames, relay racks and other equipment.

The relay racks have an iron framework screwed to the floor and in some instances into the ceiling by bolts. The iron framework of the relay racks has tiers of narrow iron strips holding the relays, which are small electro-magnetic switches. The coil rack is also an upright iron framework, kept in place by bolts screwed into the floor. It holds electrical coils, which act as distributors of electrical energy from the power plant, and thus supply telephone connections with current suitable for talking and signaling purposes.

The fuse panel is an upright slate or composition panel holding a large number of small electrical fuses set in rows. It is held by an iron framework which, like the other frames, is held secure by bolts fastened to the floor and usually in the ceiling. The power plant includes a power board in an iron framework bolted to the floor and to a wall or the ceiling. On the board are mounted fuses, overload protectors, switches to start motors, rheostats, current and voltage meters and

other electrical equipment. The power plant also includes charging machines, which are heavy and rest on the floor without fastening, and ringing machines which rest on tables secured by bolts.

Registers for counting calls made on individual subscribers lines are mounted on iron frames bolted to the floor. The test desk and chief operator's desk are generally screwed to the floor. Operators' chairs, operators' head sets and breast sets, test sets and maintenance tools are not fastened to the building in any way, but are freely movable.

Offices which have the dial type equipment are of two kinds —offices with "step-by-step" equipment and offices with "panel" type equipment. Equipment in dial offices, as in manual offices, is largely mounted in metal frames which extend from the floor close to the ceiling, the frames being screwed to the floor by means of bolts. Photographs indicate that the frames are set in rows, and, as petitioner says, bear a resemblance to the book stacks in a large library, with narrow aisles between.

It is settled that in disputes between private persons the intention of the parties is controlling in determining whether an article is a fixture and part of the realty or is personalty. In *M. P. Moller, Inc.,* v. *Wilson,* 8 Cal. (2d) 31, 37 [63 Pac. (2d) 818], the rule is thus expressed: "This court has recognized the test of intention to make the article a permanent addition to the realty as manifested by the physical facts, and has accepted the character of the annexation and the use for which the article is designed as subsidiary elements employed for the purpose of testing the intention of permanency. (*City of Los Angeles* v. *Klinker,* 219 Cal. 198 [25 Pac. (2d) 826, 90 A. L. R. 148] ; *Gosliner* v. *Briones,* 187 Cal. 557 [204 Pac. 19] ; *Oakland Bank of Savings* v. *California Pressed Brick Co.,* 183 Cal. 295 [191 Pac. 524] ; *Lavenson* v. *Standard Soap Co.,* 80 Cal. 245 [22 Pac. 184, 13 Am. St. Rep. 147].) Thus whether an article is or was physically affixed to the building is only one of the criteria in determining whether there was an intention to make it a permanent accession to the real property."

By definition in section 660, Civil Code, a thing becames a fixture when it is "permanently attached" to the realty, and permanence has reference to intent. By virtue of the im-

portance of intent, a lessee may be permitted to remove an article installed by him and constituting a trade fixture. (Sec. 1019, Civ. Code.) ■ The respondent board recognizes the importance of intent in disputes between private persons. But it contends that for purposes of taxation the "physical facts" alone should be considered. On this theory no consideration would be given to the circumstance that articles have been installed by a lessee and are trade fixtures removable by him at the end of his term. In this regard it may be said that under the above cited cases the "intent" to which weight is given where rights of those who are not parties to any private agreement are concerned, is intent as manifested by the physical facts, with due consideration to the status of the party by whom the articles have been installed. The respondent board, as we understand its contention, does not maintain that annexation, as by bolts and screws, is the only "physical fact" to be considered, to the exclusion of such facts as the nature of the article itself and its special adaption to the purposes for which the building is particularly designed. Consideration of these so-called "physical facts" alone would not provide a rule of thumb applicable without practical difficulty in all cases.

■ Respondent board further contends that the attachment of petitioner's office equipment is made with intent that is shall be "permanent", as that word is used in section 660, Civil Code. Petitioner, in support of a contrary contention, points to the fact that it may be detached by a simple operation of removing bolts and screws. The bolt and screw holes which remain cannot be said to be a substantial injury to the building. Central office equipment removed from one office is customarily used in assembling equipment in other offices unless it is too obsolete. Petitioner places special emphasis on the fact that when it removes from office premises it always removes all office equipment. Said equipment is of no use in the building but to itself. Petitioner's vice-president in charge of operations lists fourteen instances in which it has removed from central offices and the premises have been used thereafter for a wide variety of purposes.

Petitioner also refers to the Uniform System of Accounts for Telephone Companies in accordance with which it is now required to keep its accounts by the Federal Communications

Commission and the California Railroad Commission. Separate accounts are maintained for plant and for central office equipment. The plant account includes the cost of "buildings and all permanent fixtures, machinery, appurtenances and appliances installed as a part thereof". The central office account includes the cost of the equipment which the board has classified as improvements in the instant case. Overemphasis cannot be given to the placing of central office equipment in a separate account from plant, including "permanent fixtures". Said accounting classification is not shown to have been made for purposes of taxation, nor with intent to establish the legal status of central office equipment as realty or personalty.

The respondent board states that the "permanency of location of most of the central office equipment is determined not so much by the bolts and screws as by the multitude of wires that lace and interlace the equipment, binding its parts into a complex, intricate machine". In the Hollywood central office about 180,000 wires are attached to the main distributing frame, in addition to many thousands of "jumper wires" on the frame itself. If the frame were to be moved and used in a different position it would be necessary to disconnect and reconnect all these wires.

Measured in terms of investment 97 per cent of central office equipment is housed in buildings owned by petitioner, most of which have been specially designed for that purpose. The fact that articles affixed are necessary or convenient to the use of a building for the purpose for which it is designed is generally treated as tending to indicate they are realty. (*Dauch* v. *Ginsburg*, 214 Cal. 540 [6 Pac. (2d) 952]; *M. P. Moller, Inc.*, v. *Wilson, supra; Broadway Improvement etc. Co.* v. *Tumansky*, 2 Cal. (2d) 465 [41 Pac. (2d) 553].) Petitioner disputes the applicability of this principle in the instant case. In the ordinary case of articles necessary or convenient for the use of a building designed for a special purpose, the building, with equipment, has a resale or leasing value for the purpose for which it has been specially built. The equipment should pass with the building as part of the realty for the convenient use thereof. But when the telephone company ceases to use a central office, any market value is for the building without equipment.

However, the fact that central office buildings are constructed for a special use favors permanence of location and attachment of fixtures. In the territory which it serves petitioner is the only company engaged in the highly specialized business of supplying telephone service. By reason of this fact there are not available other buildings constructed for this specialized business. Furthermore, the special suitability of telephone offices restricts their salability for other purposes. These two factors— dearth of other specially designed buildings and difficulty of disposal of buildings designed for a business in which only petitioner is engaged—strongly favor permanence of location of telephone offices. In all but one of the fourteen fundamental plan areas of the Los Angeles exchange, petitioner has acquired land for future expansion. The anticipated span of recently constructed large offices is thirty-five years.

■ The great expense incident to the moving of the equipment in a large office to another telephone office or to another position within the same building make for permanence of location of telephone equipment. The estimated average life of central office equipment is twenty years. Thirty-three and one-third per cent of the cost of installing central office equipment is for labor. Disconnection and reconnection of thousands of wires and cables involve much labor, with some loss in adapting old equipment to a new location. Furthermore, the equipment is so arranged that routine wire changes, such as those necessitated daily by subscribers changing addresses and telephone numbers can be made without disturbing the permanence of location of equipment. The conclusion is inescapable that the complex mass of interconnected wires, cables, electrical and other equipment which is contained in a large central office serving many thousands of subscribers, as described and illustrated by photographs in this proceeding, constitutes together with the specially constructed building in which it is housed, and to which it is attached, a unit, which in its entirety is an improvement to realty. The fact that equipment is sometimes moved and office locations changed does not militate against this conclusion. Absolute permanence is not required.

■ Central office equipment includes such articles as head sets, breast sets and operators' stools, which are readily

portable and not attached by bolts or screws to the building. Said property is specially designed for use in connection with the attached portions of the equipment, most of it is not usable except with telephone equipment, and from the standpoint of investment it represents less than one per cent of the total equipment. There are also certain heavy machines, such as charging and ringing machines, which although not readily portable are not attached to the building by bolts or screws. Including these machines petitioner states that the percentage of nonattached property in terms of investment is between six and one-half and ten per cent. We are of the view that respondent's contention that the nonattached portions of the equipment and the attached portions together constitute a unit for use together and are improvements to realty, must be sustained. The detached portions of the equipment are constructively annexed. (*City of Los Angeles* v. *Klinker,* 219 Cal. 198, 207 [25 Pac. (2d) 826, 90 A. L. R. 148] ; *White* v. *Cincinnati etc. R. R.,* 34 Ind. App. 287 [71 N. E. 276].)

We have heretofore referred to the fact that the petitioner also operates a number of small offices. It owns 75 office buildings, and has equipment in 67 buildings or parts of buildings leased by it. From the standpoint of investment 97 per cent of its equipment is in owned buildings, due to the fact that it owns its large offices where the greatest investments are made. Photographs of several small offices occupying leased space in buildings devoted to other purposes, such as lunchrooms, have been filed in this proceeding. The switchboard in these offices approximates in size a desk and the other equipment occupies but little space. In no proper sense can equipment in small leased offices be held an improvement to and part of real property owned by another. The mere attachment of switchboard legs and equipment to floor or walls by screws or bolts does not have that effect.

It would seem that the office equipment in the bulk of petitioner's office will readily fall into one classification or the other. Petitioner may establish that the board's assessment of central office equipment as improvements to realty is erroneous as to certain offices in actions brought by it to obtain refunds of taxes arising from such classification. In such actions the facts relating to the particular offices involved may be fully developed.

Petitioner further contends that central office equipment should be held to constitute "telephone lines" within the exception provided in section 3617, Political Code. The provision is as follows: "Third—'Improvements'. The term 'improvement' includes:

"1. All buildings, structures, fixtures, fences and improvements erected upon or affixed to land, except *telephone and telegraph lines.*" (Italics ours.) Although the entire telephone system may be said in a broad sense to constitute a "telephone line", we are of the view that central office equipment should not be held to be "telephone line" within the above exception. Said exception has reference to lines of the company outside central office buildings, which lines are commonly located in or under public streets and roads or on rights of way over private lands.

Petitioner relies on our decision in *General Pipe Line Co. v. State Board of Equalization,* 5 Cal. (2d) 253 [54 Pac. (2d) 18]. That case involved a construction of the provision of section 14, article XIII, Constitution, which requires the State Board of Equalization to assess "all pipe lines, flumes, canals, ditches and aqueducts not entirely within the limits of any one county". It was held that the section applied to lines of an intercounty pipe line which was used for private and not public utility purposes. The court further held that the pumps, boilers and other appurtenances were part of the "pipe line" for assessment by the State Board of Equalization. Any other construction would have resulted in assessment of the "line", strictly speaking, by the state board, and the appurtenances by which it was operated by the local assessors, which it was the purpose of the section to avoid. We do not regard said case as controlling the operation of section 3617, Political Code.

The alternative writ is discharged and the peremptory writ of mandate is denied.

Waste, C. J., Curtis, J., Edmonds, J., and Langdon, J., concurred.