[Civ. No. 69205. Second Dist., Div. Five. Nov. 15, 1984.]

ALLSTATE INSURANCE COMPANY, Plaintiff and Appellant, v. COUNTY OF LOS ANGELES et al., Defendants and Respondents.

[No. B003245. Second Dist., Div. Five. Nov. 15, 1984.]

SECURITY PACIFIC NATIONAL BANK, Plaintiff and Respondent, v. COUNTY OF LOS ANGELES et al., Defendants and Appellants.

## COUNSEL

Baker, Ancel, Morris, Spencer & Frye, Baker, Ancel, Morris & Spencer and Mark G. Ancel for Plaintiff and Appellant.

De Witt W. Clinton, County Counsel, Edward G. Pozorski, Senior Deputy County Counsel, and Mary F. Wawro, Deputy County Counsel, for Defendants and Respondents and Defendants and Appellants.

Ehrman, Flavin, Devine & Baker and Sean Flavin for Plaintiff and Respondent.

## OPINION

**FEINERMAN, P. J.**—We have before us two separate appeals which we have consolidated for decision. They present a single legal issue: Are cer-

tain office computer systems to be classified as realty or as personalty for purposes of property taxation? The distinction is crucial because in both cases the taxpayer is exempt from taxation of personal property.[1]

In each of these cases the taxing authorities classified the property as fixtures to realty and assessed property tax accordingly. The taxpayers paid the taxes under protest and sought refunds via actions in the superior court. In 2d Civil No. 69205, judgment was entered against the plaintiff, Allstate Insurance Company (Allstate), and in favor of defendants County of Los Angeles and City of Pasadena. In B003245, judgment was in favor of plaintiff, Security Pacific National Bank (Security) and against defendants County of Los Angeles, City of Los Angeles and City of Glendale.[2] Despite the contrary rulings below,[3] we find the operative facts of the two cases to be legally indistinguishable.

## ALLSTATE

The computers in the Allstate matter are located in Allstate's regional office in Pasadena, a single story general purpose office building consisting of 106,000 square feet, of which approximately 3,000 square feet are devoted to a computer room. The building is occupied exclusively by Allstate and serves as its recordkeeping and information storage center for the Los Angeles County area. The computer equipment which serves as the subject of this appeal is located in a specially built computer room. The room was constructed by the use of prefabricated easily movable partitions which are affixed to the floor with screws and which fit into tracks which are in turn affixed to the ceiling by screws. The room contains a raised floor composed of two-foot square panels which rest upon jacks. The jacks are attached to the floor with adhesive, but are easily removable. The purpose of the raised floor is to conceal the wires and cables of the computers, for safety and esthetic reasons. The raised floor also serves as an air duct for the air conditioning system which serves the room. The building itself was constructed in 1955. Computers were first installed in it in 1957. The building was not specially designed to house computers nor were there any modifi-

---

[1]In 2d Civil No. 69205, the taxpayer is an insurance company. Such companies pay an annual tax on premiums which is in lieu of all other taxes, except taxes on real property. (Cal. Const., art. XIII, § 28; Rev. & Tax. Code, §§ 104 and 105.) The taxpayer in B003245 is a national bank. Such institutions pay taxes on net income which are in lieu of all other taxes except taxes on real property. (Cal. Const., art. XIII, § 27; Rev. & Tax. Code, §§ 104 and 105.)

[2]The defendant cities in both cases, as well as the County of Los Angeles, are represented on appeal by the Los Angeles County Counsel. For convenience sake, all defendants are referred to hereafter as "County."

[3]The cases were tried as nonjury matters by different judges.

cations to its structure to accommodate the computers other than the partitions and raised floor.

Allstate has had three different computer systems since commencing computer operations in 1957. The system in operation in 1974, the first year for which the disputed taxes were assessed, included an IBM system 370 central processing unit, a card reader punch, several printers, an IBM 2821 controller, multiple interpreters and control units, numerous disk drives and tape drives, as well as a number of modems which make possible the transmission of information from the computer to terminals outside the computer room and outside the regional office building by means of telephone hookups. In addition, the computer room contained two freestanding air conditioning units which supplemented the air conditioning which services the remainder of the building. Supplementary air conditioning was necessary because of the high level of heat generated by the computers. The supplemental air conditioners were hooked up to the building's existing water supply. Only one was in regular use, however. The second was a standby unit.

The Allstate computer system was classified as a medium size system. Although the computer component comprising the central processing unit weighed three-quarters of a ton, and the aggregate weight of all of the computer equipment in the computer room was sixteen tons, each of the individual components was on wheels and readily movable. There was, however, considerable inconvenience associated with moving the machines because they operated as a unit and disconnection of any one of the components would disrupt the operation of the system and interfere with the regular transmission of information. Nonetheless, Allstate had completely disassembled and relocated its computer room from one section of the building to another in 1979.[4] Although many months in the planning, the move was accomplished over a single weekend. The total cost of the move was approximately $3,500.

Each of the computer components was a standardized piece of equipment not specially designed for Allstate or for the insurance business per se. The various components were attached to each other by means of standardized off-the-shelf cable. Allstate regularly upgraded and replaced its computer components as needed. It should also be noted that Allstate leased some of its computer equipment. This policy was initiated because rapid technological advances made it financially advisable to do so.[5]

---

[4]The last year involved in the litigation for which the disputed assessment levied was 1979-1980.

[5]The leased equipment was not taxed to Allstate.

The factors which the trial court decided were crucial in determining that the computers owned by Allstate were fixtures and taxable as such were as follows: The court found that the computers had become affixed to the premises by virtue of their great total weight and through the use of the extensive heavy cables which interconnected the components and connected them individually to the 220-volt powerline which serviced the computer room. The court further found that because of the raised floor, the internal partitions, the 220-volt wiring and the supplemental air conditioning, the computer room constituted a special purpose building within a building which served no function except to facilitate the use of the computer system. The components of the system in turn operated together as a unit rather than individually and formed a synergistic system. Finally, the court found that there had been an intention to affix the computers to the realty because Allstate could not do business without the use of a computer system and therefore it intended the system to remain in place permanently.

## Security

The computers owned by Security were located in three separate buildings, one in downtown Los Angeles, one in Woodland Hills, a part of the City of Los Angeles, and one in Glendale. The downtown Los Angeles location was a 55-story general purpose office building which serves as the bank's main headquarters. The building contains a total of 1.3 million square feet, about 3,200 square feet of which was devoted to the use of computers. These computers, like Allstate's, were situated on a raised movable floor composed of two-foot square tiles which rested on free-standing jacks. The jacks were held to the floor by an adhesive which kept them from slipping during installation. The raised flooring could be removed without damage to the building or to itself. Two freestanding air conditioning units were installed in the area and attached to the building's main water system. The computer components were not bolted or attached to the floors or walls in any way, but were connected to a 220-volt power source and to other components by flexible electric cable. All of the components were on wheels which could be raised into the body of the component. The components could be detached from each other and from the power source by means of pulling complementary plugs.

A second set of computers was housed in a building in Woodland Hills which was leased by the bank. The bank's lease will expire in 1985, and Security intends then to move all of the computer components in that building to another building. Certain optical scanning equipment that was located in the Woodland Hills building was sold to another company in 1980 and not replaced. The computer work area in the Woodland Hills building occupies about 2,000 square feet out of a total of 63,000 square feet leased

by Security. The Woodland Hills computers are also located on a raised floor similar to that in Security's headquarters building. The flooring in Woodland Hills was purchased secondhand by Security. There was a free-standing air conditioning unit in Woodland Hills which had been brought in from another bank installation. The computer components in Woodland Hills also were on wheels. Certain of the computer components operated on a 220-volt power supply which was part of the building's regular power system. There were two optical scanners in Woodland Hills that plugged into an electrical outlet supplying 110-volt power.

The third Security building involved was located in Glendale. It was a 14-story office building, 2 stories of which, the 9th and 10th floors, were devoted to use of computers. The building was constructed by Security as an operations center. The total building area was 405,000 square feet; the area devoted to computer use was a total of approximately 43,000 square feet. Ironically, in light of the results reached below, this system was significantly larger than the Allstate system. The computers on the ninth and tenth floors were situated on raised flooring similar to that of the other two buildings. They were not bolted or otherwise attached to the flooring and walls. There was, in addition, an IBM 1401 processor on the 14th floor of the Glendale building. It did not sit on raised flooring.

All of the computer components at all three locations were standard items bought and sold in the open market and capable of general business and scientific application. Despite their size and weight, they were easily movable and most were frequently moved to different areas on the floor where they were located, as well as to different floors and from one building to another. Security substituted components from time to time, selling those they no longer needed to other users who would use them for the same general purposes. Equipment was replaced to satisfy a need for increased capacity, or for financial and tax considerations. There was no feature of any of the buildings that was essential to the operation of the computer components, and the computer components could be and were removed without any injury to the building or to the components and without diminishing the value of the building.

In determining that the computers belonging to Security were personalty and not fixtures, the trial court found that the computers were not physically affixed to the structures and that they failed to meet the test of constructive annexation because there was no evidence that they were to be used indefinitely in connection with any particular real property or that the real property needed the particular items of personal property to serve its intended purpose. The factors which the court found crucial in reaching this determination were: That the buildings were not specially designed or adapted

to house computer components, that they were ordinary office buildings which had not undergone substantial modifications, and that the equipment was modular and could be plugged in and out easily, taken off and moved.

### CONTENTIONS ON APPEAL

Allstate, relying on *Security Data, Inc.* v. *County of Contra Costa* (1983) 145 Cal.App.3d 108 [193 Cal.Rptr. 121], argues that the computers which it owned were not fixtures as a matter of law. County, as respondent in the Allstate action, asserts that *Security Data, supra,* is not strictly in point because the Court of Appeal in that decision merely sustained a finding in favor of the taxpayer which had been rendered by the trial court. Applying a similar sufficiency of the evidence test here, County contends, would lead to the conclusion that there is ample evidence to sustain the trial court's ruling. County would have us go further, however, and establish a set of guidelines which would produce uniform assessments throughout the state. It would have us hold that the existence of raised flooring, special air conditioners and a partitioned room constructed to facilitate computer operations render the entire computer system a fixture as a matter of law. In the Security case, County, as appellant, raises a single issue. It asserts that the trial court based its decision on an erroneous standard, namely that the computers were not fixtures because the buildings in which they were housed were not specially designed for the purpose of utilizing the computers and, conversely, the computers themselves were not specially designed for use by the bank.[6] Security correctly asserts that County has misstated the test which the trial court applied.

The disparate results reached by the two trial judges in the cases before us, on essentially analogous facts, leads us to conclude that the County is right when it urges, in Allstate, that something more is required of us than a simple sufficiency of the evidence analysis of the individual decisions rendered below. Contrary to the contention of the County, however, we have concluded that, as a matter of law, computer systems such as those which form the subject of the cases at bench must be classified as personalty and not as fixtures.

### DISCUSSION

The principles governing the determination of whether an item is a fixture or personalty are well established and have oft been stated as follows: "It is settled that three tests must be applied 'in determining whether

---

[6]At oral argument, the county counsel argued that uniform guidelines are also required with respect to Security.

or not an article is a fixture—namely: (1) the manner of its annexation; (2) its adaptability to the use and purpose for which the realty is used; and (3) the intention of the party making the annexation.' (*San Diego T. & S. Bank v. San Diego County*, 16 Cal.2d 142, 149 [105 P.2d 94, 133 A.L.R. 416].)" (*Simms* v. *County of Los Angeles* (1950) 35 Cal.2d 303, 309 [217 P.2d 936].)

"In resolving whether an article placed on the premises constitutes a fixture or personal property, the aforelisted three elements do not play equal parts. In making the determination in a particular case the element of intent is regarded as a crucial and overriding factor, with the other two criteria being considered only as subsidiary ingredients relevant to the determination of the intent." (*Seatrain Terminals of California, Inc.* v. *County of Alameda* (1978) 83 Cal.App.3d 69, 75 [147 Cal.Rptr. 578].) ■ "It is also settled that for tax purposes the 'intention' must be determined by the physical facts or reasonably manifested outward appearances without regard to the annexor's status as landlord or tenant. (*Trabue Pittman Corp.* v. *County of Los Angeles*, 29 Cal.2d 385 [175 P.2d 512]; cf. *San Diego T. & S. Bank v. San Diego County*, 16 Cal.2d 142 [105 P.2d 94, 133 A.L.R. 416]; *Southern Cal. Tel. Co.* v. *State Board of Equalization*, 12 Cal.2d 127 [82 P.2d 422].)" (*Simms* v. *County of Los Angeles, supra*, 35 Cal.2d 303, 309.)

■ Fixtures are statutorily defined in California as follows: "A thing is deemed to be affixed to land when it is attached to it by roots, as in the case of trees, vines, or shrubs; or imbedded in it, as in the case of walls; or permanently resting upon it, as in the case of buildings; or permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts, or screws . . . ." (Civ. Code, § 660.) Since the items here in question were not physically affixed to the property in any manner described in Civil Code section 660, the question becomes whether or not they were constructively annexed to the land according to the remaining principles described above. Surprisingly, we find that only three California appellate decisions have considered the application of these principles to computer systems.

The first such case was *Bank of America* v. *County of Los Angeles* (1964) 224 Cal.App.2d 108 [36 Cal.Rptr. 413, 6 A.L.R.3d 419], wherein the court sustained a trial court finding that a computer system was a fixture for tax purposes. Factors which the court cited in sustaining the trial court's judgment were that six out of the seven buildings in which the computers were housed were special purpose buildings designed as accounting centers requiring the computer system; the components of each system were interconnected by hundreds of signal and power cables; the floor of the buildings was raised at great cost solely for the computer system; the buildings had fewer windows than was usual for commercial buildings; there was an air

conditioning and humidity system installed for the optimum operating efficiency of the computer; the machines because of their great weight could not be moved without going to great expense; and certain of the machines were connected to air compressors by means of rigid iron pipe.

The next appellate decision to consider the status of a computer was *Exchange Bank* v. *County of Sonoma* (1976) 59 Cal.App.3d 608 [131 Cal.Rptr. 216]. There, the taxpayer was the lessee of an IBM data processing unit which was five feet high, six feet long, and two feet eight inches wide. The machine was mounted on wheels and described as easily movable. It was connected to the building in which it was located only by an electric cable plugged into a wall or floor socket. The taxing authority there had classified the machine as personalty for the tax year 1971-1972, but had assessed and collected an ad valorem real property tax for earlier years. With relatively little discussion, except to comment on the unfairness of allowing the County to retain the earlier assessed taxes in light of its own admission that the property was properly classified as personalty, the Court of Appeal affirmed a lower court decision ordering refund of the taxes.

The most recent appellate decision considering the status of computers is *Security Data, Inc.* v. *County of Contra Costa, supra,* 145 Cal.App.3d 108. There, on facts remarkably similar to those in the cases before us, the Court of Appeal sustained a trial court finding that the computers in question were personalty, not realty. The computers occupied approximately one-third of one floor of a five-story building in Walnut Creek. The building was leased by Security Data from its parent company. There, as here, the computers were situated on raised flooring, were served by supplemental air conditioning, and utilized a 220-volt power supply which was from a dedicated electrical power source. The several components of the system were interconnected with heavy duty electrical cables which were spread under the raised floor. The cables were manually plugged into outlets in the components and in the 220-volt wiring. Each of the computer components was equipped with permanent wheels, and the various components were moved from time to time. On several occasions the various components were replaced with technologically improved units. Prior to trial of the matter, Security Data had vacated the location which was the subject of the tax assessment and had moved to new quarters in Concord. They took the computers with them. The move was accomplished in a single day, albeit a long one, and cost a total of slightly over $8,000. A raised floor was installed at Security Data's new quarters in Concord at a cost of $20,000 plus the old floor from the company's previous quarters, which was traded to the flooring contractor. The partitions which closed the computer room off from the

remainder of the fifth floor in the Walnut Creek building consisted of movable panels which did not involve use of permanent studs.

The contrary results reached in *Bank of America* v. *County of Los Angeles, supra,* and *Security Data, Inc.* v. *County of Contra Costa, supra,* are easily explainable in terms of the sufficiency of the evidence rule which permits different triers of fact to reach different factual conclusions in the face of fairly similar factual circumstances. The court in *Security Data, Inc., supra,* distinguished *Bank of America, supra,* on the basis of the fact that the buildings which housed the Bank of America's computers were specially constructed for that purpose, whereas the Security Data computers were installed in a general purpose office building. We believe, however, that a more comprehensive explanation of the contrary results reached in *Bank of America, supra,* and *Security Data, Inc., supra,* is found in the technological explosion in the computer industry since the decision in *Bank of America, supra,* was rendered.

Expert evidence on that subject was presented to the trial court by plaintiff Security in the case before us, and was incorporated by the trial court into its statement of decision.[7] Paul Blumenthal, a computer expert with 30 years' experience in the industry, described massive changes which have taken place in computer design, mobility, functional versatility, modularity of components and efficiency since the days of the computers involved in *Bank of America, supra.* Blumenthal testified that the Bank of America systems had been designed expressly for the bank, to accomplish one type of task, and could not perform other types. The installation cost of those systems was 6 percent of the cost of the system. Each and every component of the Bank of America systems was essential to performance of the system's task. This contrasted with the computers employed by Security which could perform a variety of tasks, one central processor performing forty different applications simultaneously, and the various components being used interchangeably and being compatible with components of different manufacturers.

Blumenthal described a modern computer system as consisting of any number of combinations of hardware and software arranged in different ways to do different tasks depending on the owner's requirements. The mobility and interchangeability of modern computer components had cre-

---

[7]Since the County does not dispute the validity of that evidence, we deem it applicable to our consideration of the Allstate case as well.

ated a new industry in which computer components are bought and sold as commodities and traded in third party sales. There were approximately 300 used-computer dealers in the United States by 1979. The raised floors referred to in the Bank of America case were permanent and expensive installations consisting in some locations of double reinforced concrete floors with four feet in between the regular floor and the raised floor and crawl holes for engineers to repair the handwired cable. By contrast, the raised floors in both of the cases at bench are easily movable, consist of two-feet square panels and cost less money than ordinary carpeting. Special floors are not necessary for the operation of modern computers although they may be efficacious for that purpose.

The prevalence of computers in modern society requires a statement of guidelines which will lead to the uniform application of taxation laws and prevent unjustified differences in classification which result in unequal tax burdens on similarly situated taxpayers. (Cf. *Simms* v. *County of Los Angeles, supra,* 35 Cal.2d 303, 313.) Such guidelines are essential also to taxing authorities which must be able to conduct assessments and prepare budgets in an informed and reliable manner. ■ "There can be uniformity of taxation only to the extent that there is a uniform classification of real and personal property." (*Trabue Pittman Corp.* v. *County of L. A.* (1946) 29 Cal.2d 385, 392 [175 P.2d 512].) Without such guidelines, taxpayers and tax assessors alike can look forward to a series of random and conflicting decisions such as we find in the cases before us and which are dependent upon the emphasis or lack of emphasis which individual triers of fact choose to give to a variety of analogous facts.

In formulating a set of guidelines which can be uniformly applied in computer cases, we find guidance not merely in *Bank of America, supra,* and *Security Data, supra,* but in the numerous other decisions which have differentiated between fixtures and personalty. Thus, where as in *Bank of America, supra,* a special building has been constructed for the purpose of conducting a certain type of industry or housing certain equipment essential to a particular industry, the equipment necessary to the fulfillment of the purpose for which the structure was built has been held to be a fixture. (See, e.g., *Southern Cal. Tel. Co.* v. *State Board* (1938) 12 Cal.2d 127 [82 P.2d 422] [major switchboards and cables in specially constructed central telephone offices held to be fixtures, while smaller such installations in leased branch offices held to be personalty]; *City of Los Angeles* v. *Klinker* (1933) 219 Cal. 198 [25 P.2d 826, 90 A.L.R. 148] [printing presses and related equipment housed in Los Angeles Times building specially constructed to serve as printing plant held to be fixture].)

Similarly, where the land has been specially adapted to accommodate a particular item of detached or detachable property, and the presence of the item increases the value of the land, the item will be found to be a fixture. (See, e.g., *Seatrain Terminals of California, Inc.* v. *County of Alameda, supra,* 83 Cal.App.3d 69 [750-ton cranes designed to load and unload container cargo ships, and which operated on railbeds affixed to the land adjacent to the port, found to be fixtures]; *Specialty Restaurants Corp.* v. *County of Los Angeles* (1977) 67 Cal.App.3d 924 [136 Cal.Rptr. 904] [Queen Mary found to be fixture based in large part on extensive improvement to adjacent land, including construction of a dike, paving and landscaping, and access facilities including walkways, elevator and escalator].)

■ Where items which might otherwise be classified as personalty are attached to and designed for use in conjunction with items which are indisputably fixtures, the entire unit is deemed to be a fixture. (*Simms* v. *County of Los Angeles, supra,* 35 Cal.2d 303; *Trabue Pittman Corp.* v. *County of L. A., supra,* 29 Cal.2d 385; and *San Diego T. & S. Bank* v. *San Diego* (1940) 16 Cal.2d 142 [105 P.2d 94, 133 A.L.R. 416] [bank vault doors deemed fixtures on the theory that the vaults themselves were useless for that purpose absent the vault doors]; see, however, *United States Nat. Bank* v. *County of Los Angeles* (1965) 234 Cal.App.2d 195 [44 Cal.Rptr. 286] and *Pajaro Valley Bank* v. *County of Santa Cruz* (1962) 207 Cal.App.2d 621 [24 Cal.Rptr. 639] [bank safety deposit boxes, placed in, but not attached to, bank vaults found to be personalty on the theory that vaults could still function as vaults without the safety deposit boxes].)

Other factors which are considered by the courts in determining whether or not an item is a fixture are whether or not title to the item would pass with title to the realty, and whether or not the item can be removed from the structure to which it is appurtenant without serious damage either to itself or to the realty. (*Southern Cal. Tel. Co.* v. *State Board, supra,* 12 Cal.2d 127; *M. P. Moller, Inc.* v. *Wilson* (1936) 8 Cal.2d 31 [63 P.2d 818].)

■ Applying the lessons of these cases to the facts before us, we find that the factors relied on by the trial court in reaching its decision below in Security were more relevant than those relied on by the trial court in Allstate. Contrary to the County's assertion, the trial court in Security did not base its ruling solely on the fact that the machinery was not specially designed for Security, and that the buildings in which it was housed were not specially designed for the machinery. These facts were crucial, however, in determining the machinery's "adaptability to the use and purpose for

which the realty is used." (*Simms* v. *County of Los Angeles, supra,* 35 Cal.2d 303, 309.) The trial court went further, however, and found that there was no intention of annexation on the part of Security. Not only was this finding supported by substantial evidence, it was compelled by the portability and interchangeability of the machines, by their fungibility and marketability, by the fact that clearly the computers would not pass with the land, but moved with Security, and their presence at the various locations added nothing to the value of the buildings.

 By contrast, the trial court's finding of intent in Allstate rests on an erroneous premise as to the nature of the required intent. The trial court's factual finding that Allstate intended to use computers permanently is undoubtedly correct. The court's further conclusion that this intention encompasses an intention to constructively affix the computer system to the realty does not follow logically and reflects neither the reality of Allstate's situation nor that of modern business generally. Computers are not peculiar to banks and insurance companies but are found in virtually every type of commercial, retail, industrial, professional, educational and governmental institution, large and small. They are as essential and are becoming as commonplace in modern business as electric typewriters, photocopy machines, and telephones were 10 or 15 years ago. Yet those items did not become fixtures merely because they were essential to the operation of a business. Nor is the greater weight of a computer system sufficient to render it a fixture, when the machine is deliberately constructed so as to make it mobile. Were mere weight and necessity for business purposes sufficient, then circus elephants would be fixtures.

Similarly, the fact that individual components of Allstate's computer system could not be disconnected without advance planning, because to do so would disrupt operation of the computer program, does not betoken an intent to annex the computer system to the realty. Items of personalty, other than vehicles, normally are not expected to function while they are being relocated. The configuration into which modular components are assembled by a particular user is not determinative of whether a computer system is a fixture or personalty. Rather, the key factors are that the system can be removed from the realty without damage to itself or to the realty and without diminishing the value of the realty, and the objective reality is that ownership of the computer is unrelated to ownership of the land or a leasehold interest in it.

 ██ We find that standardized off-the-shelf, general purpose computers and computer components, placed in general purpose office

buildings, and connected to a power source by means of standardized plugs, and to each other by means of standardized cables, are and remain personalty regardless of whether or not use of a computer is essential to efficient and competitive operation of the business in which they are employed. Minor structural alterations to the realty in which such computers are situated, such as movable partitions or flooring, supplemental air conditioning units, and 220-volt wiring, do not alter the character of such computers from personalty to realty.[8]

---

[8]On October 18, 1983, after trial of the cases at bench, the State Board of Equalization filed certain new regulations regarding fixtures. (Cal. Admin. Code, tit. 18, § 122.5.) The regulations, while recognizing the importance of the three elements enunciated in *Simms* v. *County of Los Angeles, supra,* 35 Cal.2d 303, 309, contain the following specific proviso with respect to computers: "*Computer hardware components are fixtures if extensive improvements, such as a building (or portion of a building), air conditioning, emergency power supply, and a fire suppression system are constructed specifically to accommodate the components,* and the improvements are not useful or are only marginally useful other than as housing and support of the components. A computer is personal property if it can be moved without material damage or expense and it is not essential to the intended use of the real estate. A computer is constructively annexed to a fixture if it is dedicated to controlling or monitoring the fixture and is otherwise necessary for the intended use of the fixture." (Cal. Admin. Code, tit. 18, § 122.5, subd. (b)(7), italics added.)

The regulation further provides: "Machines that are not physically annexed to the realty and that do not operate interdependently with the realty are personal property even though special flooring, conduits, and/or overhead racks are installed to accommodate wiring from a power source to the machines, because special accommodations for wiring are normal features of an industrial building and the building is fully usable for its intended purpose (as an industrial building) without the particular machines." (Cal. Admin. Code, tit. 18, § 122.5, subd. (b)(8).) This latter proviso and the nonitalicized portion of paragraph (b)(7) are consistent with the standards we herein adopt. To the extent that the italicized portion of paragraph (b)(7) might be interpreted to apply to the type of movable partitions and supplementary air conditioning systems utilized in the cases at bench, it is hereby disapproved.

On September 7, 1984, the Governor signed urgency legislation (Assem. Bill No. 2345) relating to the preparation of supplemental assessment rolls and property taxes. Section 6.5 of that legislation added section 75.15 to the Revenue and Taxation Code. It provides, in pertinent part: "Property may be considered physically annexed if the weight, the size, or both are such that relocation or removal of the property would be so difficult that the item appears to be intended to remain in place indefinitely. [¶] Property shall not be considered physically annexed to realty solely because of attachment of the realty by 'quick disconnect' attachments, such as simple wiring and conduit connections. [¶] Property not physically annexed to realty (including fixtures) is constructively annexed if it is a necessary, integral, or working part of the realty. Factors to be considered in determining whether the property is a necessary, integral, or working part of the realty are whether the nonattached item is designed or committed for use with specific realty, or whether the realty can perform its desired function without the nonattached item. [¶] Property connected to the realty by quick disconnect conduits which contain power or electronic cable, or allow for heating, cooling, or ventilation service to the connected property is constructively annexed only if it satisfies one of the factors in the above paragraph."

We interpret the factor of size and weight referred to in section 75.15 above to be negated in the cases at bench by the previously described mobility of the computer components. We further conclude that the standards we have adopted are entirely consistent with the legislative policy expressed in section 75.15.

The judgment in B003245 is hereby affirmed. The judgment in 2d Civil 69205 is reversed and the matter is remanded for further proceedings to determine the amount of the refund to which Allstate is entitled.

Ashby, J., and Hastings, J., concurred.

A petition for a rehearing was denied December 10, 1984, and the opinion was modified to read as printed above. The petition of defendants and appellants and defendants and respondents for a hearing by the Supreme Court was denied January 23, 1985.